## Case No. 15,747.

### UNITED STATES v. MAURICE et al.

#### [2 Brock. 96.] [1]

Circuit Court, D. Virginia. May Term, 1823.

OFFICERS—APPOINTMENT—BOND — SURETIES — IRREGULAR APPOINTMENT—CONTRACT—CONSIDERATION—ACCOUNTING FOR PUBLIC MONEY.

1. The constitution of the United States (article 2, § 2), which declares that the president "shall nominate, and, by and with the consent of the senate, shall appoint ambassadors, &c," "and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law," taken in connexion with the subsequent clause of the same section, which authorizes congress "by law to vest the appointment of such inferior officers as they think proper, in the president alone, in the courts of law, or in the heads of departments," and with the third section of the same article empowering the president to fill "all vacancies that may happen during the recess of the senate, by granting commissions which shall expire at the end of their next session," is interpreted to declare, that all offices under the federal government, except in cases where the constitution itself may otherwise provide, shall be established by law.

[Cited in Auffmordt v. Hedden, 137 U. S. 327, 11 Sup. Ct. 108.]

[Cited in Com. v. Ford, 5 Pa. St. 68; Lewis v. Jersey City, 51 N. J. Law, 242, 17 Atl. 112.]

2. An agent of fortifications is an officer of the United States, whose office is established by law. See acts of congress of April 24,

---

[2] This reference is at fault; but is taken literally from Judge Martin's book.

[1] [Reported by John W. Brockenbrough, Esq.]

1816, § 9 [3 Stat. 298], and March 2, 1821, § 13 [3 Stat. 616].

[Cited in Smith v. Whitney, 116 U. S. 181, 6 Sup. Ct. 577.]

[Cited in Guthrie Daily Leader v. Cameron (Okl.) 41 Pac. 636.]

3. The act of congress, passed on the 15th of May, 1820 [3 Stat. 592], providing for the better organization of the treasury department, which gives a new and summary remedy against officers of the United States, who have received public money for which they have failed to account, and against their sureties, substituted by implication the new and sufficient bond called for by that act, for the former bond, and discharged the sureties to the original bond, so far as respected subsequent transactions.

4. Appointments to office can be made by the heads of department, in those cases only which congress has authorized by law, and, therefore, the appointment of an agent of fortifications by the secretary of war, there being no act of congress conferring that power upon that officer, is irregular.

[Cited in Browne v. U. S., Case No. 2,036.]

5. An official bond given by an agent of fortifications, whose appointment was irregular, but whose office is established by law, though void as a statutory obligation, is valid as a contract to perform the duties appertaining to the office of agent of fortifications, and is binding on his sureties. Contract is one of the means necessary to accomplish the objects of the institution of the government, and the capacity of the United States to contract is co-extensive with the duties and powers of government. Every contract which subserves the performance of a duty, may be rightfully made.

[Cited in U. S. v. Hartwell, 6 Wall. (73 U. S.) 393; U. S. v. Garlinghouse, Case No. 15,189; Hall v. Wisconsin, 103 U. S. 8; Van Brocklin v. Tennessee, 117 U. S. 154, 6 Sup. Ct. 672; Auffmordt v. Hedden, 137 U. S. 327, 11 Sup. Ct. 108.]

[Cited in State v. May, 106 Mo. 506, 17 S. W. 660; City of Ellsworth v. Rossiter, 46 Kan. 237, 26 Pac. 675; Com. v. Evans, 74 Pa. St. 140; Dickson v. U. S., 125 Mass. 314. Approved in Jones v. Scanland, 6 Humph. 198. Cited in McCornick v. Thatcher, 8 Utah, 294, 30 Pac. 1093; In re Merriam's Estate, 141 N. Y. 497, 36 N. E. 506. Cited in brief in State v. Bates, 36 Vt. 389. Cited in State v. Wilson, 29 Ohio St. 348; Weston v. Sprague, 54 Vt. 402.]

6. It is not essential to the validity of a contract made between an individual and the government, that it should express the circumstances under which it was made, so precisely and distinctly, as to show the motives which induced it, and the objects to be effected by it. These are matter of evidence.

[Cited in Hall v. Wisconsin, 103 U. S. 8.]

[Cited in Williamson v. Hall, 1 Ohio St. 193.]

7. The duty of the government to secure its debts, necessarily infers the means of securing them, and sureties may therefore be required to the bond given by the debtor.

8. Every contract which is legal on its face, and imports a consideration, is supposed to be entered into on valid considerations, and to be obligatory, if the parties be ostensibly able, until the contrary is shown, and the same rule applies to a government which is capable of making contracts.

9. That is certain which may be rendered certain, and, therefore, if the condition of a bond, instead of specifying the particular purposes for which the bond is given, refers to a paper which does specify them, it is equivalent to

the enumeration of those purposes in the bond itself.

10. Where an appointment to office is irregular—is contrary to law and its policy, this does not absolve the person so appointed from the moral and legal obligation to account for public money, which has been placed in his hands in consequence of such appointment.

[Approved in Jones v. Scanland, 6 Humph. 198.]

At law.

MARSHALL, Circuit Justice. This is an action of debt brought upon a bond executed on the 18th day of August, 1818, in the penalty of twenty thousand dollars, with the following condition: "Whereas the said James Maurice has been appointed agent for fortifications on the part of the United States, now, therefore, if the said James Maurice shall truly and faithfully execute and discharge all the duties appertaining to the said office of agent, as aforesaid, then the above obligation to be void, &c." The breach assigned in the declaration is, that large sums of money came to the hands of the said Maurice, as agent of fortifications, which he was bound by the duties of his office faithfully to disburse and account for, a part of which, namely, forty thousand dollars, he has, in violation of his said duty, utterly failed to disburse to the use of the United States, or account for; wherefore, &c. The defendants, the sureties in the said obligation, prayed oyer of the bond, and of the condition, and then demurred to the declaration. The plaintiff joined in the demurrer. The defendants also pleaded several pleas, on some of which issue has been made up, and on others, demurrer has been joined.

The first point to be considered is the demurrer to the declaration. The defendants insist that the declaration cannot be sustained, because the bond is void in law, it being taken for the performance of duties of an office, which office has no legal existence, and consequently, no legal duties. No violation of duty, it is said, can take place, when no duty exists. Since the demurrer admits all the facts alleged in the declaration, which are properly charged, and denies that those facts create any obligation in law, it must be taken as true that James Maurice was in fact appointed an agent of fortification on the part of the United States: that he received large sums of money in virtue of that appointment, and has failed to apply it to the purpose for which he received it, or to account for it to the United States. As the securities certainly intended to undertake that Maurice should perform the very acts which he has failed to perform, and as the money of the nation has come into his hands on the faith of this undertaking, it is the duty of the court to hold them responsible, to the extent of this undertaking, unless the law shall plainly interpose its protecting power for their relief, upon the principle that the bond creates no legal obligation. Is this such a bond? The first step in

this inquiry, is the character of the bond. Does it, on its face, purport to be a mere official bond, or to be in the nature of a contract? This question is to be answered by a reference to the terms in which its condition is expressed. These leave no shadow of doubt on the mind. The condition refers to no contract—states no undertaking to perform any specific act—refers to nothing—describes nothing which the obligor was bound to do, except to perform the duties of an officer. It recites that he was appointed to an office, and declares that the obligation is to be void if he "shall truly and faithfully execute and discharge all the duties appertaining to the said office." Of the nature of those duties no information whatever is given. Whether the disbursement of public money does or does not constitute a part of them, is a subject on which the instrument is entirely silent. The bond, then, is, on its face, completely an official bond, given, not for the performance of any contract, but for the performance of the duties of an office, which duties were known, and had been prescribed by law, or by persons authorized to prescribe them. In his declaration, the attorney for the United States has necessarily taken up this idea, and proceeded on it. In his assignment of breaches, he states that the said James Maurice had been appointed agent of fortifications, and alleges that he had not performed the duties of the said office, nor kept the condition of his bond, but that the said condition is broken in this, that while he held and remained in the said office, divers large sums of money came to his hands, as agent of fortifications, which he was bound by the duties of his office faithfully to disburse and account for; a part of which, forty thousand dollars, he has, in violation of his said duty, utterly failed to disburse or account for. On this breach of his official duty, which is alleged to constitute a breach of the condition of his bond, the action is founded. No allusion is made to any other circumstance whatever as giving cause of action.

The suit then is plainly prosecuted for a violation of the duty of office, which is alleged to constitute a breach of an official bond. The court must, on this demurrer, at least, so consider it, and must decide it according to those rules which govern cases of this description. This being a suit upon an official bond, the condition of which binds the obligors only that the officer should perform the duties of his office, it would seem that the obligation could be only co-extensive with these duties. What is their extent? The defendants contend that no such office exists; that James Maurice was never an officer, and, of consequence, was never bound by this bond to the performance of any duty whatever. To estimate the weight of this objection, it becomes necessary to examine the constitution of the United States, and the acts of congress in relation to this subject. The constitution (article 2, § 2), declares, that the president "shall nominate, and, by and with the advice and consent of the senate, shall appoint ambassadors, &c.," "and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law." I feel no diminution of reverence for the framers of this sacred instrument, when I say that some ambiguity of expression has found its way into this clause. If the relative "which," refers to the word "appointments," that word is referred to in a sense rather different from that in which it had been used. It is used to signify the act of placing a man in office, and referred to as signifying the office itself. Considering this relative as referring to the word "offices," which word, if not expressed, must be understood, it is not perfectly clear whether the words "which" offices "shall be established by law," are to be construed as ordaining, that all offices of the United States shall be established by law, or merely as limiting the previous general words to such offices as shall be established by law. Understood in the first sense, this clause makes a general provision, that the president shall nominate, and by and with the consent of the senate, appoint to all offices of the United States, with such exceptions only as are made in the constitution; and that all offices (with the same exceptions) shall be established by law. Understood in the last sense, this general provision comprehends those offices only which might be established by law, leaving it in the power of the executive, or of those who might be entrusted with the execution of the laws, to create in all laws of legislative omission, such offices as might be deemed necessary for their execution, and afterwards to fill those offices.

I do not know whether this question has ever occurred to the legislative or executive of the United States, nor how it may have been decided. In this ignorance of the course which may have been pursued by the government, I shall adopt the first interpretation, because I think it accords best with the general spirit of the constitution, which seems to have arranged the creation of office among legislative powers, and because, too, this construction is, I think, sustained by the subsequent words of the same clause, and by the third clause of the same section. The sentence which follows, and forms an exception to the general provision which had been made, authorizes congress "by law to vest the appointment of such inferior officers as they think proper, in the president alone, in the courts of law, or in the heads of departments." This sentence, I think, indicates an opinion in the framers of the constitution, that they had provided for all cases of offices. The third section empowers the president "to fill up all vacancies that may happen during the recess of the senate, by granting commissions which shall expire at the end of their next session." This power is not confined to vacancies which may happen in offices created by law. If the

convention supposed that the president might create an office, and fill it originally without the consent of the senate, that consent would not be required for filling up a vacancy in the same office. The constitution then is understood to declare, that all officers of the United States, except in cases where the constitution itself may otherwise provide, shall be established by law.

Has the office of agent of fortifications been established by law? From the year 1794 to the year 1808. congress passed several acts, empowering the president to erect fortifications, and appropriating large sums of money to enable him to carry these acts into execution. No system for their execution has ever been organized by law. The legislature seems to have left this subject to the discretion of the executive. The president was, consequently, at liberty to employ any means which the constitution and laws of the United States placed under his control. He might, it is presumed, employ detachments from the army, or he might execute the work by contract, in all the various forms which contracts can assume. Might he organize a corps. consisting of labourers, managers, paymasters, providers, &c., with distinct departments of duty, prescribed and defined by the executive, and with such fixed compensation as might be annexed to the various parts of the service? If this mode of executing the law be consistent with the constitution, there is nothing in the law itself to restrain the president from adopting it. But the general language of the law must be limited by the constitution, and must be construed to empower the president to employ those means only which are constitutional. According to the construction given in this opinion to the second section of the second article of that instrument, it directs that all offices of the United States shall be established by law; and I do not think that the mere direction that a thing shall be done, without prescribing the mode of doing it, can be fairly construed into the establishment of an office for the purpose, if the object can be effected without one. It is not necessary, or even a fair inference from such an act, that congress intended it should be executed through the medium of offices, since there are other ample means by which it may be executed, and since the practice of the government has been for the legislature, wherever this mode of executing an act was intended, to organize a system by law, and either to create the several laws. expressly, or to authorize the president in terms, to employ such persons as he might think proper, for the performance of particular services. If, then, the agent of fortifications be an officer of the United States, in the sense in which that term is used in the constitution, his office ought to be established by law, and cannot be considered as having been established by the acts empowering the president, generally, to cause fortifications to be constructed.

Is the agent of fortifications an officer of the United States? An office is defined to be "a public charge or employment," and he who performs the duties of the office, is an officer. If employed on the part of the United States, he is an officer of the United States. Although an office is "an employment," it does not follow that every employment is an office. A man may certainly be employed under a contract, express or implied, to do an act, or perform a service, without becoming an officer. But if a duty be a continuing one, which is defined by rules prescribed by the government, and not by contract, which an individual is appointed by government to perform, who enters on the duties appertaining to his station, without any contract defining them, if those duties continue, though the person be changed; it seems very difficult to distinguish such a charge or employment from an office, or the person who performs the duties from an officer. If it may be converted into a contract, it must be a contract to perform the duties of the office of agent of fortifications, and such an office must exist with ascertained duties. or there is no standard by which the extent of the condition can be measured.

The army regulations are referred to in acts of congress. passed previous and subsequent to the execution of the bond under consideration. A copy of those regulations purporting to be a revisal made in the war office, in September, 1816, conformably to the act of the 24th of April, 1816, has been laid before the court, and referred to by both parties. These regulations provide for the appointment, and define the duties of the agents of fortifications. They are to be governed by the orders of the engineer department in the disbursement of the money placed in their hands. They are to provide the materials and workmen deemed necessary for the fortifications; and they are to pay the labourers employed. In the performance of these duties they are directed to make out—First, an "abstract of articles purchased;" secondly, "an abstract of labour performed;" thirdly, "an abstract of pay of mechanics;" and fourthly, "an abstract of contingent expenses." These duties are those of a purchasing quartermaster, commissary, and paymaster. These are important duties. A very superficial examination of the laws will be sufficient to show, that duties of this description, if not performed by contract, are performed by persons who are considered as officers of the United States, whose offices are established by law. If, then, we look at the bond and declaration, we find in both every characteristic of an office bond. If we look at the army regulations, the only additional source of information within our reach, we find the duties of an agent of fortifications to be such as would make him an officer of the United States. Is the office established by law? The permanent agents mentioned in the act of March 3, 1809, c. 199, § 3 [4 Bior. & D. Laws. 221; 2 Stat. 536, c. 28], are those who are appointed, "either for

the purpose of making contracts or for the purchase of supplies, or for the disbursement, in any other manner, of moneys, for the use of the military establishment of the United States." If this act authorizes the appointment of such agents, and virtually establishes their offices, it cannot, I think, in correct construction, be extended to other persons than those who are employed in some manner in disbursing money "for the use of the military establishment or navy of the United States." "The military establishment" is a term which seems to be well defined in the acts of congress, and to be well understood, and I do not think the act can be construed to comprehend an agent of fortifications.

In the act of March 3, 1817, c. 517, § 5, it is made the duty of the secretary of war "to prepare general regulations, better defining and prescribing the respective duties and powers in the adjutant-general, inspector-general, quartermaster-general, and commissary of ordnance, department of the topographical engineers, of the aids of generals, and generally of the general and regimental staff; which regulations, when approved by the president of the United States, shall be respected and obeyed, until altered or revoked by the same authority." The exclusive object of this section is, I think, the regulation of existing offices. I do not think it can be fairly construed to extend to the establishment of offices. Yet if under this act, subordinate agencies or offices have in fact been introduced, such offices may be established by subsequent acts of congress. The act of April 24, 1816, "for organizing the general staff, and making farther provision for the army of the United States" (section 9), enacts, "that the regulations in force before the reduction of the army, be recognised, as far as the same shall be found applicable to the service, subject, however, to such alterations as the secretary of war may adopt, with the approbation of the president."

A legislative recognition of the actually existing regulations of the army must be understood as giving to those regulations the sanction of the law; and the subsequent words of the sentence authorize the secretary of war to alter those regulations with the approbation of the president. Such alterations have also the sanction of the act of 1816. This subject appears to have been taken up by the secretary. A pamphlet entitled, "Army Regulations Revised, Conformably to the Act of 24th of April, 1816," has been laid before the court as authentic, and has been appealed to by both plaintiff and defendants, as being the same regulations which are approved and adopted by the act of the 2d of March, 1821, § 13. These regulations direct the appointment of agents of fortifications, and define their duties. They purport to have been revised in the war office, in September, 1816. If the provision they contain respecting agents of fortifications formed a part of the army regulations prior to the act of the 24th of

April, 1816, it is recognised by that act. If that provision was first introduced in September, 1816, it is recognised by that act. If that provision was first introduced in September, 1816, it may, if approved by the president, be considered as an alteration authorized by that act. The question whether this alteration has been approved by the president, is perhaps a question of fact, not examinable on this demurrer. When I consider the act of the 24th of April, 1816, and this revisal in the war office, in connexion with the act of the 2d of March, 1821, adopting the revisal of September, 1816, under the name of general regulations of the army, compiled by Major General Scott (for they are represented as being the same regulations), I feel much difficulty in saying that the office of agent of fortifications was not established by law when this bond was executed. I am more inclined to give this opinion, because I am persuaded this cause must be carried before a tribunal which can make that certain which was before uncertain; and because, by overruling the demurrer to the declaration, the other questions of law which occur in the cause, and which would be arrested by sustaining the demurrer to the declaration, will all be brought before the supreme court.

The defendants pleaded several pleas to the declaration. The second plea is, that the defendant, James Maurice, performed the condition of his bond up to the 26th day of September, 1820, on which day a new bond was executed, in pursuance of the act of the 15th of May, 1820, "providing for the better organization of the treasury department." The plaintiff takes issue on that part of the plea which alleges performance up to the 26th day of September, 1820, and demurs to the residue.—The act under which this new bond was executed, gives a new and summary remedy against officers of the United States who had received public money for which they had failed to account, and against their sureties, and contains a proviso: "That the summary process herein directed, shall not affect any surety of any officer of the United States who became bound to the United States before the passing of this act; but each and every such officer shall, on or before the thirtieth day of September next, give new and sufficient sureties for the performance of the duties required of such officer." Section 2. The defendants contend that this new and sufficient bond was a substitute for the old one, and discharged the sureties to the original obligation, so far as respects subsequent transactions.

The plaintiff contends that the bond is cumulative, and that the sureties to the first obligation continue bound for any subsequent as well as any preceding default of the officer. There is certainly no express declaration of the act on this subject; and if the second bond operates a discharge of the first, this effect is produced by implication only: yet the implication is very strong in favour of the

construction. The sole object of the law is to obtain sureties against whom the new and summary remedy it gives might be used. To obtain additional security, does not appear to be one of the motives for which it was passed. The direction that the sureties should be "new" and "sufficient," countenances the opinion that they were solely relied on for the subsequent transactions of the officer. If no additional security was intended to be demanded; if the sole object of the law was to coerce the giving of sureties, against whom this new remedy, by distress, might be used, it seems reasonable to think that the legislature supposed the new sureties alone responsible for the subsequent conduct of their officer. It could not escape the consideration of the legislature, that the same friends who became bound in the first bond, might probably become bound in the second, thinking themselves discharged from the first. But friends may be willing to become bound in a penalty within their resources, or to an amount to which the officer can secure them, and very unwilling to become bound in double that sum. The officer may be able to give security in a penalty of $25,000, and totally unable to give security for $50,000. The government fixes the penalty in which an officer shall give bond and sureties, and is regulated, in fixing that penalty, by all the considerations which belong to the subject. It ought not to be considered as augmenting that penalty, unless the means used for augmenting it are plain, direct, and intelligible. In this case, if the same sureties execute the new bond, they are liable to a double penalty, by an act not clearly understood to have that effect. If there are new sureties to the new bond, the attention of the old sureties may be diverted from watching the conduct of the officer, and they may even be induced to relinquish liens on property, in order to enable the officer to find his new sureties. If the course of legislation on the subject has been such as to furnish to the original sureties reasonable ground for the opinion that they were discharged from all liability for the subsequent conduct of the officer, and reasonable ground for the implication that such was the intention of the legislature, and I think it has, such ought to be the construction of the act. This demurrer, therefore, is overruled.

The fifth plea is, that James Maurice was never legally appointed, but was, on the 1st day of August, 1818, appointed by the secretary of war, agent of fortifications for Norfolk, Hampton Roads, and the lower part of the Chesapeake Bay, without any provisions of law whatever, authorizing and empowering him to make such appointment, and directly contrary to an act entitled, an act &c., passed the 3d of March, 1809. To this plea there is a demurrer.

The first question arising on this demurrer, respects the validity of this appointment, made by the secretary of war. It is too clear, I think, for controversy, that appointments to office can be made by heads of department, in those cases only which congress has authorized by law; and I know of no law which has authorized the secretary of war to make this appointment. There is certainly no statute which directly and expressly confers the power; and the army regulations, which are exhibited as having been adopted by congress, in the act of the 2d of March, 1821, declares that agents shall be appointed, but not that they shall be appointed by the secretary of war. If this mode of appointment formed a part of the regulations previous to the revision of September, 1816, that is a fact which might or might not be noticed if averred in the pleadings. The court is not informed of its existence by this demurrer. It must therefore be supposed not to exist, and James Maurice cannot be considered as a regularly appointed agent of fortifications.

This brings us to the question in the cause on which I have felt, and still continue to feel, great difficulty. The appointment of James Maurice having been irregular, is this bond absolutely void, or may it be sustained as a contract entered into by a person not legally an officer, to perform certain duties belonging to an office? If the office had no existence, it has been already stated, that a bond to perform its duties generally, could create no obligation, but since the office does exist, the condition refers to something certain by which the nature and extent of the undertaking of the obligor may be determined. It is an undertaking that James Maurice shall perform the duties appertaining to the office of agent of fortifications: and this undertaking is in the nature of contract. If this contract does not bind the parties according to its expressed extent, its failure must be ascribed to some legal defect or vice inherent in the instrument. It is contended that the bond is void, because there is an inability on the part of the United States to make any contract not previously directed by statute. The United States is a government, and, consequently, a body politic and corporate, capable of attaining the objects for which it was created, by the means which are necessary for their attainment. This great corporation was ordained and established by the American people, and endowed by them with great powers for important purposes. Its powers are unquestionably limited; but while within those limits, it is a perfect government as any other, having all the faculties and properties belonging to a government, with a perfect right to use them freely, in order to accomplish the objects of its institutions. It will certainly require no argument to prove that one of the means by which some of these objects are to be accomplished, is contract; the government, therefore, is capable of contracting, and its contracts may be made in the name of the United States. The government acts by its agents, but it is neither usual nor necessary to express, in

those contracts which merely acknowledge the obligation of an individual to the United States, the name of the agent who was employed in making it. His authority is acknowledged by the individual when he executes the contract, and is acknowledged by the United States when the government asserts any right under that contract. I do not mean to say that there exists any estoppel on either party; I only mean to say that a contract executed by an individual, and received by the government, is prima facie evidence that it was entered into between proper parties. So with respect to the subject of the contract.

Without entering on the inquiry respecting the limits which may circumscribe the capacity of the United States to contract, I venture to say that it is co-extensive with the duties and powers of government. Every contract which subserves to the performance of a duty, may be rightfully made. The constitution, which has vested the whole legislative powers of the Union in congress, has declared that the president "shall take care that the laws be faithfully executed." The manner in which a law shall be executed does not always form a part of it; a power, not limited or regulated by the words of the acts, has been given by the legislature to the executive, to construct fortifications; and large sums of money have been appropriated to the object. It is not and cannot be denied, that these laws might have been carried into execution by means of contract; yet, there is no act of congress, expressly authorizing the executive to make any contract in the case. It is useless, and would be tedious, to multiply examples, but many might be given to illustrate the truth of the proposition. It follows, as a necessary consequence, that the duty, and of course the right, to make contracts may flow from an act of congress, which does not in terms prescribe this duty; the proposition then is true, that there is a power to contract in every case where it is necessary to the execution of a public duty.[2]

It remains to inquire, whether it be indispensable to the validity of a contract, that it should express the circumstances under which it was made, so precisely and distinctly, as to show the motives which induced it, and the objects to be effected by it. This certainly is often done, and in many cases conduces to a clear understanding of the intention of the parties, and of the obligations which the instrument creates; but it is not universally practised, would be often inconvenient, and is necessary, I think, only so far as may be requisite to explain the nature of the contract. We know too well that persons entrusted with the public money, are often defaulters. It is not, I believe, doubted, that the law raises an assumpsit to pay the money which the defaulter owes. An overpayment is sometimes made by mistake; is not the receiver liable to the United States? Yet, there is no act of congress creating the assumpsit in either case. I presume it will not be denied, that a declaration charging that the defendant was indebted to the United States, for money had and received to their use, and that being so indebted, he assumed and promised to pay it, would be sufficient without setting forth at large all the circumstances of the character in which, and the objects for which, the money was received. If the law would raise an implied assumpsit, which would be binding, I cannot conceive that an express assumpsit would be less so; nor can I conceive that such express assumpsit, more than the implied assumpsit, need detail the various circumstances on which its va-

---

[2] Since the above opinion was delivered, the question, whether a bond taken by the United States, for a lawful purpose, but not prescribed by any law, is absolutely void? has been twice carried before the supreme court of the United States, and in both instances the doctrine laid down by the chief justice has been fully sustained. In U. S. v. Tingey, 5 Pet. [30 U. S.] 115, the court held that "the United States, being a body politic, as an incident to their general right of sovereignty, have a capacity to enter into contracts, and take bonds in cases within the sphere of their constitutional powers, and appropriate to the just exercise of those powers, through the instrumentality of the proper department to which those powers are confined, whenever such contracts or bonds are not prohibited by law, although the making of such contracts, or taking such bonds, may not have been prescribed by any pre-existing legislative act. The court laid down this as a general principle only, without (as was then said) attempting to enumerate the limitations and exceptions, which may arise from the dis-

tribution of powers in the government, and from the operation of other provisions in our constitution and laws." But the court, in applying the principle to the case then before them, further added: "We hold that a voluntary bond, taken by authority of the proper officers of the treasury department, to whom the disbursement of public moneys is entrusted, to secure the fidelity in official duties of a receiver, or an agent for the disbursement of public moneys, is a binding contract between him and his sureties, and the United States, although such bond may not be prescribed or required by any positive law. The right to take such a bond is, in our view, an incident to the duties belonging to such a department; and the United States having a political capacity to take it, we see no objection to its validity in a moral or a legal view. From the doctrine here stated, we have not the slightest inclination to depart: on the contrary, from further reflection, we are satisfied that it is founded upon the soundest principles, and the just interpretation of the constitution. Upon any other doctrine, it would be incompetent for the government, in many cases, to take any bond or security for debts due to it, or for deposits made of the public money; or even to enter into contracts for the transfer of its funds from one place to another, for the exigencies of the public service, by negotiable paper or otherwise; since such authority is not expressly given by law in a vast variety of cases." Opinion of the supreme court in U. S. v. Bradley, 10 Pet. [35 U. S.] 343. See, also, Dugan v. U. S., 3 Wheat. [16 U. S.] 172; 4 Pet. Cond. R. 223, and Postmaster General v. Early, 12 Wheat. [25 U. S.] 136; 6 Pet. Cond. R. 480.

lidity might depend. These would be matter of evidence. In any case where an assumpsit would be valid, the government may certainly take a bond, and I perceive no reasons why sureties may not also be demanded. It is the duty of the government to collect debts due to it, however they may have accrued; it results from this duty that the means of securing and collecting the public money may be used. Sureties may therefore be required to the bond demanded from the debtor; the instrument itself is an admission that it is given for a debt, and it is contrary to all our received opinions to require, that it should show how the debt was contracted. Any thing which destroys its validity may, undoubtedly, be shown in pleading; but a bond given to the United States, is, I think, prima facie evidence of debt, and would be sustained on demurrer. So if money be committed to the care of any person for a legitimate object, bond and security on the same principle may be required, with condition that he shall account for it. The jurisdiction of a limited court must undoubtedly appear on the record; but I do not think that the same rule applies to contracts. Infants, femes covert, idiots, and persons under duress, are not bound by their contracts. But their disability must be shown by pleading, and it need not appear in any contract that the parties to it are not liable to these disabilities. Every contract which is legal on its face, and imports a consideration, is supposed to be entered into on valid consideration, and to be obligatory, if the parties be ostensibly able, until the contrary is shown; and the same rule applies to a government which is capable of making contracts.

2. It is also contended that this bond is void, because it is entered into on a consideration which is either forbidden by express law, or contrary to the general policy of the law. The plea refers to the act passed on the 3d of March, 1809, "to amend the several acts for the establishment and regulation of the treasury, war, and navy departments." I have already said, that I do not consider the prohibition of this act as comprehending agents of fortifications, because they do not belong to the military establishment, nor do their employments relate to it. It is unnecessary to enter into any argument in support of this opinion, because it is of no importance to the point under consideration. The effect, if the act applied to the office, would be to show that the appointment of James Maurice to the office of agent of fortifications was not legal—and that effect is produced by the construction I have given to the constitution. I consider the appointment of James Maurice to the office of agent of fortifications, by the secretary of war, as invalid; but the question, is the bond void on that account? still remains to be considered. It was undoubtedly intended as an office bond, and was given in

the confidence that James Maurice was legally appointed to office. If the suit was instituted to punish him for the neglect of duty, in the nature of non-user, or for any other failure, which could be attributed in any degree to the illegality of his appointment, I should be much disposed to think the plea a bar to the action. But this suit is brought to recover the money of the United States which came to the hands of James Maurice, in virtue of his supposed office, and which he has neither applied to the purpose for which he received it, nor returned to the treasury. In such a case, neither James Maurice, nor those who undertook for him, can claim any thing more than positive law affords them. The plea does not controvert, but must be understood to confess the material facts charged in the declaration. It must be understood to confess that the money of the United States came to the hands of James Maurice as agent of fortifications; that it was the duty of such agent to disburse it for the use of the United States, in the manner prescribed by the army regulations, or to account for it; that he has failed to do either, and that they were bound for him in this respect. Admitting these things, they say it is a bar to the action brought for the money, that his appointment was illegal.

If the bond contained no reference to the appointment of James Maurice, as agent of fortifications; if its condition stated only, that certain certain sums of money had been delivered to him to be disbursed under the discretion of the principal engineer, in the purchase of materials for fortifications, and in the payment of labourers, its obligation, I presume, would not be questioned. It would be a contract which the United States might lawfully make. If, instead of specifying the particular purposes for which the money was received, the condition of a bond refers to a paper which does specify those purposes, I know of no principle of reason or of law, which varies the obligation of the instrument from what it would be, if containing that specification within itself. That is certain which may be rendered certain, and an undertaking to perform the duties prescribed in a distinct contract, or in a law, or in any other known paper prescribing those duties, is equivalent to an enumeration of those duties in the body of the contract itself. This obligation is an undertaking to perform the duties appertaining to the office of agent of fortifications. Those duties were prescribed in the army regulations, and were such as any individual might lawfully undertake to perform. The plea does not allege that the thing to be done was unlawful, nor does it allege that the illegality of the appointment to office constituted any impediment to a performance of the condition of the bond. Were it even improper to disburse the money received in the manner intended by the contract, it

could not be improper to return it. There can be nothing unlawful in the engagement to return it. The obligation to return it, as in every other case of money advanced by mistake, is one, which, independent of all express contract, would be created by the law itself. So far as respects the receiver himself, he would be bound by law to return the money not disbursed, and if he would be so bound, why may not others be bound with him for his doing that, which law and justice oblige him to do?

Admitting the appointment to be irregular, to be contrary to the law and its policy, what is to be the consequence of this irregularity? Does it absolve the person appointed from the legal and moral obligation of accounting for public money which has been placed in his hands in consequence of such appointment? Does it authorize him to apply money so received to his own use? If the policy of the law condemns such appointments, does it also condemn the payment of moneys received under them? Had this subject been brought before the legislature, and the opinion be there entertained that such appointments were illegal, what would have been the probable course? The secretary of war might have been censured; an attempt might have been authorized to make him ultimately responsible for the money advanced under the illegal appointment; but is it credible that the bond would be declared void? Would this have been the policy of those who make the law? Let the course of congress in another case answer this question. It is declared to be unlawful for any member of congress to be concerned in any contract made on the part of the United States, and all such contracts are declared to be void. What is the consequence of violating this law, and making a contract against its express provisions? A fine is imposed on the violator, but does he keep the money received under the contract? Far from it. The law directs that the money so received shall be forthwith repaid, and in case of refusal or delay, "every person so refusing or delaying, together with his surety or sureties, shall be forthwith prosecuted at law, for the recovery of any such sum or sums of money advanced as aforesaid." If, then, this appointment be contrary to the policy of the law, the repayment of the money under it is not, and a suit may, I think, be sustained, to coerce such repayment on the bond given for that purpose.

The cases cited by the defendants, do not, I think, support the plea. Collins v. Blantern, 2 Wils. 341, was a bond given, the consideration of which was illegal. It was to compound a prosecution for a criminal offence. It was to induce a witness not to appear and give testimony against a person charged with the commission of a crime. The court determined that the bond was void, and that the illegal consideration

might be averred in the plea, though not appearing in the condition. It is only wonderful that this could ever have been doubted. The case of Paxton v. Popham, 9 East, 408, and the case of Pole v. Harrobin, reported in a note in page 416 of the same volume, are both cases in which bonds were given for the payment of money for the performance of an act which was contrary to law. These cases differ in principle from that at bar. The bond was not given to induce the illegal appointment, or for any purpose in itself unlawful. The appointment had been made, and the object of the bond was to secure the regular disbursement of, or otherwise accounting for, public money advanced for a lawful purpose. The bond was not then unlawful, though the appointment was. The case of Nares v. Rowles, 14 East, 510, was a suit on a bond given by a collector and his sureties, for the due collection and payment to the receiver general, of certain duties assessed under an act of parliament. The duties were collected, but not paid to the receiver general; in consequence of which, the collector was displaced, and suit brought against one of the sureties in the bond. The defence was, that the duties were not in law demandable, and this defence was founded on an ambiguity in the language of the act. The argument turned chiefly on the words of the statute, but the counsel for the plaintiffs contended also, that supposing the act not to impose the taxes, yet the bond would not be void, for such a security might well be taken, that the duties which were actually collected should not be lost, but might be preserved, to be paid over to those who should be found ultimately entitled to receive the money. It was competent for him to enter into a bond to pay over voluntary payments made to him, although he might not have been able to enforce payment of the rates, from those who might refuse. In answer to this argument, it was said, that unless the act gave authority to assess and collect the duties, he was no collector, and could not be subject to any obligation for not paying money over to the plaintiffs, in that character, which was obtained by extortion. The court seemed inclined to this opinion, but determined that the taxes were imposed and assessed according to law, and therefore gave judgment for the plaintiffs. The impression which may, at the first blush, be made by this case, will be effaced by an attentive consideration of it. If the money collected was not due by law, the plaintiffs could have no right to receive it, and had, consequently, no cause of action against the defendant. The money sued for was not their money, but the money of the individuals from whom it had been unlawfully collected. The bond to collect and pay over this money to the receiver general, was a bond to do an unlawful act. The contract would have been clearly against law. In giving

his opinion on this subject, the chief justice said: "Looking at the condition of this bond, as it appears upon the record, I cannot say that if the rates were collected without any authority, the collector could be called upon to pay them over, because he would be answerable to the individuals from whom he had received the money, and would be entitled to retain it for his own indemnity."

The case at bar is, in principle, entirely different from that of Nares v. Rowles. This is not money obtained illegally from others, and, therefore, returnable to them, but is the money of the United States, drawn out of the treasury. The person holding it is not entitled "to retain it for his own indemnity," against the claims of others, for there are no others who can claim it. The justice of the case requires, I think, very clearly that the defendants should be liable to the extent of their undertaking, and I do not think the principles of law discharge them from it. I am therefore of opinion that the demurrer to this plea ought to be sustained, and that judgment on it be rendered for the plaintiffs.