# Application of the Appointments Clause to a Statutory Provision Concerning the Inspector General Position at the Chemical Safety and Hazard Investigation Board

A statutory provision declaring that the Inspector General of the Environmental Protection Agency "shall, by virtue of such appointment, also hold the position of Inspector General" of the Chemical Safety and Hazard Investigation Board does not violate the Appointments Clause of the Constitution, because it constitutes the permissible addition of germane duties to an office, rather than appointment to a new office.

July 27, 2006

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD

Congress has provided that the Inspector General of the Environmental Protection Agency ("EPA") "shall, by virtue of such appointment, also hold the position of Inspector General" of the Chemical Safety and Hazard Investigation Board ("CSHIB" or "Board"). Pub. L. No. 109-54, 119 Stat. 499, 543 (2005). The Board has requested our opinion on whether this provision violates the Constitution's Appointments Clause, U.S. Const. art. II, § 2, cl. 2, on the ground that Congress, rather than the President or an appropriate department head, has thereby appointed the EPA Inspector General to the distinct office of Inspector General of the Board. In considering this question, we have received and benefited from extensive submissions by both the Board and the EPA Inspector General. We conclude that the provision is constitutional. It constitutes the permissible addition of germane duties to an office, rather than appointment to a new office.

## I.

Congress established the Board in the 1990 amendments to the Clean Air Act, codified in relevant part at 42 U.S.C. § 7412(r)(6) (2000). The members of the Board are appointed by the President, with the advice and consent of the Senate, to five-year terms. *Id*. § 7412(r)(6)(B).

The Board has three primary statutory duties: (1) to "investigate . . . , determine and report" the facts and cause "of any accidental release [of a 'hazardous substance into the ambient air,' *id*. § 7412(r)(2)] resulting in a fatality, serious injury or substantial property damages"; (2) to "issue periodic reports" to various entities, "including the [EPA] and the [Department of Labor's] Occupational Safety and Health Administration, concerned with the safety of chemical production, processing, handling and storage," in which the Board is to recommend changes in regulation or policy by the EPA or the Labor Department in this area; and (3) to "establish by regulation" binding rules for "reporting accidental releases into the ambient air." *Id*. § 7412(r)(6)(C). Under certain circumstances, the EPA or

the Labor Department is required to respond with reasons for rejecting any Board recommendation or at least to consider the Board's recommendations. *Id*. § 7412(r)(6)(H)–(K). The EPA must "provide to the Board such support and facilities as may be necessary for operation of the Board" and is authorized to enforce the Board's reporting regulations; the Board in turn "may use any information gathering authority of [EPA] under this chapter," *id*. § 7412(r)(6)(P), (O) & (M), although it has its own statutory authority to gather information, *id*. § 7412(r)(6)(L). Finally, the Board is not "responsible to or subject to supervision or direction, in carrying out any duties under this subsection, of any officer or employee or agent of the [EPA], the Department of Labor or any agency." *Id*. § 7412(r)(6)(R).[1] Although Congress established the Board in 1990, the Board received no funding until Fiscal Year 1998. *See* Pub. L. No. 105-65, 111 Stat. 1344, 1368 (1997).

The Inspector General Act ("IG Act") creates an Inspector General ("IG"), appointed by the President with the advice and consent of the Senate, and a corresponding Office of Inspector General, for the Executive Branch departments and enumerated major agencies, administrations, and other "establishments," including the EPA. 5 U.S.C. app., IG Act §§ 2, 3 & 11 (2000). For several other "designated Federal entities," a category that includes Amtrak and many regulatory commissions, the Act creates an IG, with a corresponding Office, appointed by the head of the entity rather than the President. *Id*. § 8G.

IGs have the duties (1) to "audit[] and investigat[e] . . . the programs and operations" of their agencies; (2) to seek ways "to promote economy, efficiency, and effectiveness in the administration of," and "to prevent and detect fraud and abuse in," the "programs and operations" of their agencies; and (3) "to provide a means for keeping the head[s]" of their agencies, as well as Congress, "informed about problems and deficiencies relating to the administration of such programs and operations and the necessity for and progress of corrective action." *Id*. § 2 (stating purposes); *see id*. § 4(a) (specifying duties). We have explained that "Congress intended the [IG] to be an objective official free from general regulatory responsibilities who investigated the employees and operations of the Department, as well as its contractors, grantees, and other recipients of federal funds, so as to root out waste and fraud." *Inspector General Authority to Conduct Regulatory Investigations*, 13 Op. O.L.C. 54, 55 (1989) ("*IG Authority*").

---

[1] When signing the 1990 amendments, the President noted "serious constitutional concerns" with provisions, now codified at 42 U.S.C. § 7412(r)(6)(B) & (R) (2000), that restrict presidential removal of Board members and review of and policy guidance to the Board (provisions he believed "severable") and that "invade the deliberative processes of the executive branch" by requiring the Board to transmit its reports to Congress concurrently with their transmission within the Executive Branch. *See* Statement on Signing the Bill Amending the Clean Air Act (Nov. 15, 1990), 2 *Pub. Papers of Pres. George Bush* 1602, 1603–04 (1990). These provisions do not affect our analysis.

Under the IG Act, an entity that is neither an enumerated department or other establishment nor a designated federal entity falls into the residual category of "Federal entity." 5 U.S.C. app., IG Act § 8G(a)(1). The head of a "Federal entity" must prepare annually a report stating "whether there has been established in the Federal entity an office that [would] meet the requirements" for an IG Office in a designated federal entity. *Compare id.* § 8G(h)(2)(A) *with id.* § 8G(b). If not, the report must "specif[y] the actions taken by the Federal entity otherwise to ensure that audits are conducted of its programs and operations." *Id.* § 8G(h)(2)(B).

As it is not specifically listed in the IG Act, the Board falls into this residual category. But in successive appropriations for the Board beginning with Fiscal Year 2001, Congress provided that "there shall be an [IG] at the Board who shall have the duties, responsibilities, and authorities specified in the Inspector General Act of 1978." Pub. L. No. 106-377, app. A, 114 Stat. 1441, 1441A-36 (2000). Congress repeated this language in the 2002 appropriation, adding "hereafter" at the beginning. Pub. L. No. 107-73, 115 Stat. 651, 679 (2001). Congress further provided that "an individual appointed to the position of the [IG] of the Federal Emergency Management Agency (FEMA) shall, by virtue of such appointment, also hold the position of [IG] of the Board." 114 Stat. at 1441A-36. FEMA then had a presidentially appointed IG. 5 U.S.C. app., IG Act § 11(2). For Fiscal Year 2004, following FEMA's absorption into the new Department of Homeland Security, Congress transferred the Board's IG function to the EPA IG, by providing that "the individual appointed to the position of [IG] of the [EPA] shall, by virtue of such appointment, also hold the position of [IG] of the Board." Pub. L. No. 108-199, 118 Stat. 3, 399 (2004). Congress has repeated this provision for Fiscal Years 2005 and 2006. See Pub. L. No. 108-447, 118 Stat. 2809, 3322 (2004); Pub. L. No. 109-54, 119 Stat. at 543.

## II.

As explained below, we find no violation of the Appointments Clause in Congress's transfer of the Board's IG function to the EPA IG. After setting out the applicable rules, we resolve two preliminary questions and then show how Congress's direction to the EPA IG to serve as Board IG is the addition of germane duties to the office of EPA IG, which is permissible under the Appointments Clause.

## A.

The Constitution's Appointments Clause provides for offices to be "established by law." U.S. Const. art. II, § 2, cl. 2; *see also United States v. Maurice*, 26 F. Cas. 1211, 1213–14 (C.C.D. Va. 1823) (No. 15,747) (Marshall, Circuit Justice). That clause also provides four specific means of appointing persons to hold established offices. The default is that officers be appointed by the President with the advice

and consent of the Senate, but Congress "may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. As the Supreme Court has put it, "That all persons who can be said to hold an office under the government about to be established under the Constitution were intended to be included within one or the other of these modes of appointment there can be but little doubt." *United States v. Germaine*, 99 U.S. 508, 510 (1878); *see Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam) (same); *see also id*. at 128–31 (discussing proposals rejected at the Constitutional Convention to vest appointment power in Congress). Thus, Congress may create offices, and may choose among a few means of filling inferior offices, but may not itself fill any office subject to the Appointments Clause.

Given this division of authority, "a statute creating a new office *and* conferring it and its duties on the incumbent of an existing office would be unconstitutional under the Appointments Clause." *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 157 (1996) ("*Separation of Powers*") (emphasis added). As a corollary, Congress may not "alter the duties and powers of existing offices . . . to achieve substantially the same result." *Id*.; *see Shoemaker v. United States*, 147 U.S. 282, 300 (1893) ("[W]hile Congress may create an office, it cannot appoint the officer."); *Weiss v. United States*, 510 U.S. 163, 174 (1994) (Congress may not "circumvent[] the Appointments Clause by unilaterally appointing an incumbent to a new and distinct office"); Pres. James Buchanan, Letter to the House of Representatives (June 25, 1860), *in* 7 *A Compilation of the Messages and Papers of the Presidents* 3128, 3129 (James D. Richardson ed., 1897) ("It has been alleged . . . that this clause is unconstitutional because it has created a new office and has appointed Captain Meigs to perform its duties. If it had done this, it would have been a clear question, because Congress have no right to appoint to any office."). But where Congress has simply "increase[d] the power and duties of" positions, and the new duties are "germane to the offices already held by" the incumbents, the Supreme Court has found no infirmity. *Shoemaker*, 147 U.S. at 301; *see also id*. at 289 (Congress may "intrust the performance of particular duties to officials already charged with duties of the same general description") (describing holding of lower court); *Weiss*, 510 U.S. at 174–76; *id*. at 195–96 (Scalia, J., concurring in part and concurring in judgment). This Office has concurred in that view. *Separation of Powers*, 20 Op. O.L.C. at 157–59; *Status of the Director of Central Intelligence Under the National Security Intelligence Reform Act of 2004*, 29 Op. O.L.C. 28, 36 n.2 (2005) ("*Status of DCI*").

We have indicated that it is helpful, in applying *Shoemaker*'s "germaneness" test, to ask whether an officer's functions, with the addition by Congress to his original duties, "could be said" to have been "'within the contemplation of those who were in the first place responsible for [his] appointment and confirmation,'"

and we also have considered "the reasonableness of assigning the new duties 'in terms of efficiency and institutional continuity.'" *Separation of Powers*, 20 Op. O.L.C. at 158 (quoting *Legislation Authorizing the Transfer of Federal Judges From One District to Another*, 4B Op. O.L.C. 538, 541 (1980) ("*Transfer of Federal Judges*")). *Shoemaker* itself restated its germaneness test in two parts, concluding that "the duty which the military officers in question were called upon to perform cannot fairly be said to have been dissimilar to, or outside of the sphere of, their official duties." 147 U.S. at 301. The latter phrase suggests an inquiry into what the appointing authority reasonably could have anticipated as within the "sphere of" an office at the time of the last appointment before its duties increased. *Cf. Olympic Fed. Sav. & Loan Ass'n v. Director, Office of Thrift Supervision*, 732 F. Supp. 1183, 1193 (D.D.C. 1990) (finding violation where Congress largely continued powers of three-person board but consolidated them in single, designated, pre-existing officer); *Weiss*, 510 U.S. at 175 (in applying germaneness analysis to military officers holding the position of military judge, looking to a "long tradition" of the roles of military officers "in the operation of the military justice system"). In advising that it would not violate the Appointments Clause to merge the Court of Claims and the Court of Customs and Patent Appeals without reappointing the judges, we reasoned "that the functions of judges on the new court were sufficiently like those in the positions being abolished to view the legislative redesignations as a modification of an existing position under *Shoemaker*," and added that "it could be said that the judges' functions on the merged court were within the contemplation of those who were in the first place responsible for their appointment and confirmation." *Transfer of Federal Judges*, 4B Op. O.L.C. at 541.

### B.

Before reaching the germaneness inquiry with regard to the Board, we must resolve two preliminary questions. First, Congress has not conferred new duties on a particular person which would plainly violate the Constitution. It has conferred new duties on a particular office, regardless of who may hold it: Whoever holds one particular IG office (first at FEMA and then at EPA) also assumes the IG duties for the Board. Congress has, through the language of the Fiscal Year 2002 appropriation, permanently established the position of Board IG. Yet it has continued to designate the EPA IG to fill that position in annual appropriations (and it conceivably could seek to re-assign the duty each year). Should that practice continue, one might argue that each annual provision works a new Appointments Clause violation.[2] But the question whether such uses of annual

---

[2] Although Congress has power to add to or subtract from the duties of an office, it conceivably could abuse that power to the point of unconstitutionality. The issue would be similar to one that can arise with Congress's power to abolish an office. Congress may do so, even though such action

appropriations violate or would violate the Appointments Clause begs the question we must answer under *Shoemaker*. If the position of IG of the Board is properly understood as an addition to the duties of the EPA IG rather than the creation of a new office, then Congress in annually so providing is merely repeating the same permissible grant of authority to the EPA IG, which is within its rights. The limit to such a practice in the context of the Appointments Clause is imposed by the germaneness test itself, not by any separate rule.

Second, one might think it unnecessary to consider germaneness when legislation uses words that establish a distinct position and designate the incumbent of an existing office to hold that new position. Here, Congress has provided that "hereafter there shall be an Inspector General at the Board," 115 Stat. at 679, and "an Inspector General" does, in general, hold a distinct office. Furthermore, Congress has, in assigning the functions of the Board IG to the EPA IG, consistently referred to "the position" of Board IG, e.g., 118 Stat. at 398, a term that could be a synonym for "office." The term "position" may suggest more than a mere addition of duties to the office of EPA IG. It may be argued in this way that Congress has created a new office.

The better view, however, is that one must look not to the labels that Congress has used but to the particular duties that it has added to an office; the germaneness test is the proper mechanism for assessing this question. The Appointments Clause speaks of the power to appoint "Officers." An officer holds an office, and an "office" for purposes of the Clause "is essentially a collection of duties and authorities," rather than "a title" or label. *Status of DCI*, 29 Op. O.L.C. at 30–31; *see United States v. Hartwell*, 73 U.S. 385, 393 (1867) ("The term ['office'] embraces the ideas of tenure, duration, emolument, and duties."). Thus, we have concluded that the position of Director of the Central Intelligence Agency, created by intelligence-reform legislation, is merely "a continuation of the office of" Director of Central Intelligence, notwithstanding a change in title, reduction of duties, and some other changes. Our conclusion rested primarily on a comparison of duties. *See Status of DCI*, 29 Op. O.L.C. at 31–32. When Congress adds rather than subtracts duties, there is a risk that it has created a new office and purported to fill it, which the Constitution forbids. But the way to answer that question is through a germaneness analysis of the duties in issue. *Id*. at 36 n.2.

The facts and reasoning of *Shoemaker* confirm this duties-based approach. There, Congress had created a five-member commission with authority to select and to secure the purchase of land for Rock Creek Park in the District of Columbia. The statute provided "[t]hat the Chief of Engineers of the United States Army, the Engineer Commissioner of the District of Columbia, and three citizens to be

---

effectively removes an officer. But Congress may not abuse this power through "ripper" legislation, by nominally abolishing one office, simultaneously creating a "new" but essentially identical office, and then requiring a new appointment. *See Status of DCI*, 29 Op. O.L.C. at 34–35.

appointed by the President, by and with the advice and consent of the Senate, be, and they are hereby, created a commission." Act of Sept. 27, 1890, ch. 1001, § 2, 26 Stat. 492, 492 (1890). Congress had created five new positions of "commissioner"; three of the commissioners were to be selected in the way that officers ordinarily are appointed, yet Congress had designated the remaining two commissioners to be the holders of certain existing offices.

The Shoemakers thus had a credible objection "that two members of the commission were appointed by Congress." 147 U.S. at 288. They argued that "the act itself defines these park commissioners to be public officers, because it prescribes that three of them are to be civilians, to be nominated by the President and confirmed by the Senate," and "the other two are likewise 'officers,' whose appointment should have" conformed to the Appointments Clause. *Id*. at 300. Yet the Supreme Court unanimously rejected this argument:

> [W]e do not think that, because additional duties, germane to the offices already held by them, were devolved upon them by the act, it was necessary that they should be again appointed by the President and confirmed by the Senate. It cannot be doubted, and it has frequently been the case, that Congress may increase the power and duties of an existing office without thereby rendering it necessary that the incumbent should be again nominated and appointed.
>
> . . . .
>
> [I]n the present case, the duty which the military officers in question were called upon to perform cannot fairly be said to have been dissimilar to, or outside of the sphere of, their official duties.

*Id*. at 301. The Court considered not the different titles of commissioner, Chief of Engineers, and Engineer Commissioner, but rather the relationship of the "additional duties" and increased "power and duties" of a commissioner to the pre-existing "official duties" of those military offices. Although the three civilian commissioners might hold offices, it did not follow that the two *ex officio* commissioners each held a new, additional office. The lower court likewise had reasoned "that it was not unconstitutional for the legislature to intrust the performance of particular duties to officials already charged with duties of the same general description." *Id*. at 289. A focus on form likely would have produced a different result.

The Supreme Court again followed a duties-based analysis a hundred years later in *Weiss*. Congress had created the distinct positions of military judges (who presided over courts-martial) and provided for them to be selected from among qualified military officers. As military officers, the judges already had been appointed by the President with the advice and consent of the Senate, but they

were to be selected as judges by a Judge Advocate General, not the head of a department. 510 U.S. at 167–68. In addition, there was no dispute that military judges "act as 'Officers' of the United States." *Id*. at 169. Yet, as in *Shoemaker*, the Court concluded unanimously that another appointment was not needed, rejecting the argument "that the position of military judge is so different from other positions to which [a military] officer may be assigned." *Id*. at 170. The Court made two factual points: (1) "[a]lthough military judges obviously perform certain unique and important functions, all military officers, consistent with a long tradition, play a role in the operation of the military justice system," and (2) "the position of military judge is less distinct from other military positions than the office of full-time civilian judge is from other offices in civilian society." *Id*. at 175.

## C.

Thus, one cannot answer the Appointments Clause question simply by noting Congress's reference to the "position" of Board IG. The question, instead, is whether the duties of IG of the Board are "germane" to those of the EPA IG. We conclude that they are.

The general duties of the Board IG and the EPA IG are defined identically, by the same statute. The duties of the EPA IG, since the office's creation, have been defined by those sections of the Act that set out the duties of any IG. *See* 5 U.S.C. app., IG Act § 4(a) (defining "the duty and responsibility of each [IG]"); *id*. § 2 (stating purposes of IG Offices); *id*. § 11(2) (requiring an IG, with the duties defined in section 4, for the EPA). These common duties, as explained above in Part I, include conducting audits, making certain kinds of recommendations and reports, and conducting investigations "so as to root out waste and fraud." *IG Authority*, 13 Op. O.L.C. at 55. In creating the position of Board IG, Congress simply cross-referenced these same duties, stating that he "shall have the duties, responsibilities, and authorities specified in the Inspector General Act of 1978, as amended." 115 Stat. at 679.

It does not follow that Congress could assign to any existing IG the position of IG at any other department, agency, or entity. We previously have said, for example, that it is a close question (one we declined to decide) whether Congress may provide that a federal judge, upon completing a temporary administrative assignment, would have the option to return to his home district or circuit or, instead, serve in the District of Columbia Circuit. *Transfer of Federal Judges*, 4B Op. O.L.C. at 538. Even though "service as a judge on one federal court is surely 'germane' to judicial service on another," we recognized that a judge's "appointment and confirmation are predicated on the expectation that he will in fact be serving in that district or circuit." *Id*. at 540. Similarly, here the IG Act defines the duties of an IG "with respect to the establishment within which his Office is

established." 5 U.S.C. app., IG Act § 4(a); *see also id*. § 3(a) ("Each [IG] shall report to and be under the general supervision of the head of the establishment involved"); *id*. § 8G(b) & (d) (IG office to be created "in each designated Federal entity," with the IG being supervised by the head of that entity). And we have advised informally, in commenting on pending legislation, that it would violate the Appointments Clause to add to the Office of Special Inspector General for Iraq Reconstruction, without reappointment, duties relating to relief and reconstruction in Louisiana and elsewhere arising out of Hurricane Katrina.

It is enough to recognize that, not only do the Board IG and the EPA IG have the same general statutory duties, but in addition these two positions involve entities that have closely related functions and a history of interacting, and the addition of Board IG duties to the EPA IG does not work a significant increase in the duties of the EPA IG.

First, it is not as if an IG from one agency were being given additional duties as IG for another unrelated agency. In carrying out his IG duties for the EPA and the Board, the EPA IG addresses similar operational matters. The provisions of the Clean Air Act summarized above in Part I indicate that the Board's functions serve the regulatory missions of the EPA and the Labor Department. Indeed, the Board's investigations, rulemaking proposals, and reporting roles are, under the statute, aimed at assisting the EPA and Labor in reducing the risk of future hazardous chemical releases. The Board's regulatory authority involves promulgating rules that require reporting of such releases. Those rules in turn enable the Board to perform the investigations that lead to its recommendations to the two agencies that do have primary regulatory responsibility over these matters—the EPA and the Labor Department. And it appears from the statute that the Board's mission has a greater connection with the work of the EPA than the Labor Department.[3]

Second, as explained above in Part I, the Board is merely an undesignated "Federal entity" under the IG Act, rather than a department, enumerated agency, or even a designated federal entity. And the IG Act contemplates that at least audits of undesignated federal entities should be conducted in some fashion. *See* 5 U.S.C. app., IG Act § 8G(h)(2). The performance of IG functions for an undesignated federal entity by an IG who exists pursuant to the IG Act, and whose pre-existing duties involve, as here, subjects similar to those involved in the additional IG functions, could (at least presumptively) be said to be within the contemplation of those who were responsible for that IG's appointment. *See Separation of Powers*, 20 Op. O.L.C. at 158. Such additional duties likely are not "outside the sphere of," and are "of the same general description" as, his pre-existing duties, *Shoemaker*, 147 U.S. at 301, 289, and the addition likely is reasonable in terms of efficiency, *see Separation of Powers*, 20 Op. O.L.C. at 158.

---

[3] We have no occasion to answer the moot question of the germaneness of the duties of the Board IG to those of the former FEMA IG.

Furthermore, the EPA IG has received little additional staff, resources, or salary to carry out the additional duties of Board IG, and this fact tends to confirm that the increase in duties is not significant. A significant addition to an office's duties is more likely to be outside the sphere of its existing duties, *see Status of DCI*, 29 Op. O.L.C. at 36 n.2, and thus to "amount to assuming a new 'Offic[e]' within the meaning of" the Appointments Clause, *Weiss*, 510 U.S. at 196 (Scalia, J., concurring). Here, however, in establishing the position of Board IG, Congress has required the IG who received that function to use personnel of his existing IG Office rather than establish a new IG Office for the Board, and has barred him from appointing any individuals to positions within the Board. *See, e.g.*, 115 Stat. at 679 (FY 2002); 118 Stat. at 399 (FY 2004). Similarly Congress has not appropriated separate funds for the Board IG; instead, it has left the EPA IG to carry out his duties with regard to the Board from his appropriation for the EPA IG Office. In its Fiscal Year 2001 appropriation, for example, Congress included no funds for the Board IG in its appropriation for the Board, provided a $10,000,000 appropriation for the FEMA IG, and added that the FEMA IG "shall also serve as" the Board IG. 114 Stat. at 1441A-36 & A-46. Since transferring the Board IG function to the EPA IG, Congress has continued to include no money for the Board IG in its appropriations for the Board. *See, e.g.*, 118 Stat. at 399. Instead, in conference reports on appropriations bills for the EPA, the congressional conferees have expressed views on how much of its appropriation the EPA IG Office should spend on the Board IG function and have requested that the EPA include in its budget requests an amount sufficient to carry out this function. *See, e.g.*, H.R. Rep. No. 108-401, at 1127 (2003). Under these circumstances, combined with both the general and specific similarities in duties, there is no reason to conclude that Congress has appointed the EPA IG to a new and distinct office rather than simply adding germane duties to his existing office.

The Board does, in addition to being an entity distinct from the EPA, operate with a statutory protection against any responsibility to, or supervision or direction by, officers or employees of the EPA, *see* 42 U.S.C. § 7412(r)(6)(R); *see also id.* § (6)(A) (referring to Board as "independent"), but that independence does not make the duties of the Board IG any less germane to the pre-existing duties of the EPA IG. As a statutory matter, Congress is free to revise this independence, such as by separately providing—as it has in the appropriations provisions at issue— that an officer in the EPA shall have certain duties with regard to the Board. Nor can there be any statutory objection to the EPA IG's "supervising" his own work as Board IG: The role of Board IG is not one of the functions or duties established for the Board in section 7412 and therefore is not subject to the provision regarding lack of direction or supervision by EPA officers. *See id.* § 7412(r)(6)(R).

The question is whether it is relevant to the constitutional germaneness analysis that Congress first granted this independence and then (arguably) removed some of it by assigning the function of Board IG to the EPA IG. Congress's initial grant

of statutory independence might be said to have placed the duties of any Board IG outside the sphere of the EPA IG's duties and not within the reasonable contemplation of the President and Senate in appointing the EPA IG. One might argue that the President and Senate, in determining the suitability of an appointee for the office of EPA IG, did not have a reasonable opportunity to determine whether he possessed appropriate qualifications for carrying out the duties of Board IG.

Whatever the merits of such an argument in general, it does not apply here, because the statutory independence of the Board involves its operational, programmatic duties under section 7412(r)(6), which do not include the functions of its IG. Although an IG does have broad powers of auditing and investigation, *see* 5 U.S.C. app., IG Act §§ 4(a) & 6, these are distinct from program operating authority, which he expressly does not have. *See id*. § 9(a)(2) (prohibiting the transfer of any "program operating responsibilities" to an IG); *id*. § 8G(b) (in creating IG for designated federal entities, "there shall not be transferred to such office any program operating responsibilities"). Rather, "Congress intended the [IG] to be an objective official free from general regulatory responsibilities." *IG Authority*, 13 Op. O.L.C. at 55. An IG also cannot take personnel action against an agency officer or employee outside of his direct subordinates. 5 U.S.C. app., IG Act §§ 6(a)(6), (b)(2). Apart from auditing and investigating, he merely reports and recommends action to his agency's head, *id*. §§ 4(a), 5(a) & (d), or in certain cases to the Attorney General, *id*. § 4(d). It is for the agency head, not the IG, to direct and supervise an agency's officials. Even an IG's narrow authority over his direct subordinates, *see id*. § 6(a)(7), is irrelevant here, where the Board IG has, by statute, no distinct office or staff. Moreover, lest these statutory limits be transgressed, the IG Act requires that the EPA IG in his role as Board IG report to and be under the general supervision of the Board, not the EPA Administrator or his deputy. *See id*. § 3(a) ("Each [IG] shall report to and be under the general supervision of the head of the establishment involved"); *id*. § 8G(d) (same with IGs in a designated federal entity). In this regard, the EPA IG will have two distinct masters—the Board and the EPA Administrator—but only one for each role. And the EPA IG is removable by, and thus ultimately accountable to, not the Administrator but the President, *see id.* § 3(b), to whom the Board could appeal. Much as the EPA cannot be said to be under the supervision or direction of, or responsible to, its IG—else the Administrator would be a subordinate of the IG—the Board is not under the supervision or direction of, or responsible to, the Board IG, and thus not under an EPA officer. Thus, in the area of IG duties, there is no background rule of Board independence from the EPA that might affect the Appointments Clause analysis.

Finally, a contrary view of the relevance of the Board's operational independence likely would prevent Congress from assigning to any IG office that is not vacant the duties of Board IG, given that the statute prohibits "any . . . agency" from supervising or directing the Board's operations. 42 U.S.C. § 7412(r)(6)(R).

Congress would have been required either to establish a separate IG (with staff) for a micro-agency that has a budget of $9.2 million, *see* 119 Stat. at 543, and (we understand) approximately 40 employees, or to create the position of Board IG pending the next vacancy in and appointment to some other IG office. Such a choice, if not absurd, is at least counter-intuitive. We see no basis in the Appointments Clause for forcing Congress into it.

For all of these reasons, there is no violation of the Appointments Clause in Congress's provision for the position of Board IG.

C. KEVIN MARSHALL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
