# Constitutional Limitations on Federal Government Participation in Binding Arbitration

The Appointments Clause does not prohibit the federal government from submitting to binding arbitration.

Nor does any other constitutional provision or doctrine impose a general prohibition against the federal government entering into binding arbitration, although the Constitution does impose substantial limits on the authority of the federal government to enter into binding arbitration in specific cases.

September 7, 1995

MEMORANDUM OPINION FOR THE ASSOCIATE ATTORNEY GENERAL

You have asked for our opinion as to whether the Constitution in any way limits the authority of the federal government to submit to binding arbitration.[1] Specifically, you have asked us to explain and expand on advice we issued on September 19, 1994, in which we confirmed our earlier oral advice that "the Office of Legal Counsel no longer takes the view that the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, bars the United States from entering into binding arbitration." Memorandum for David Cohen, Director, Commercial Litigation Branch, Civil Division, from Dawn Johnsen, Deputy Assistant Attorney General, Office of Legal Counsel, Re: Binding Arbitration (Sept. 19, 1994).[2] Below, we reiterate this conclusion and, pursuant to your request, set forth the reasoning by which we reached it. In addition, we consider, again pursuant to your request, the various other constitutional provisions that may be implicated when the federal government enters into binding arbitration. We conclude that none absolutely bars the federal government from taking such action. We should point out, however, that Exec. Order No. 12778 remains in effect. See Civil Justice Reform, 56 Fed.

---

[1] Several components of the Department of Justice have submitted comments on the subject of binding arbitration. See Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Carol DiBattiste, Director, Executive Office for United States Attorneys, Re: Binding Arbitration Involving the Federal Government as a Party (Mar. 1, 1995) ("EOUSA memorandum"); Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Frank W. Hunger, Assistant Attorney General, Civil Division, Re: Constitutionality of Binding Arbitration Involving the Federal Government as a Party (Feb. 28, 1995) ("Civil Division memorandum"); Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Lois J. Schiffer, Assistant Attorney General, Environment and Natural Resources Division, Re: Binding Arbitration Involving the Federal Government as a Party (Feb. 24, 1995) ("ENRD memorandum").

[2] The Office of Legal Counsel has never issued an opinion on the matter. Then Assistant Attorney General for the Office of Legal Counsel William Barr, however, testified that the Appointments Clause would prohibit the government from entering into binding arbitration unless arbitrators were appointed by one of the methods described in that Clause, which they typically are not. See Administrative Dispute Resolution Act of 1989: Hearing Before the Subcomm. on Oversight of Gov't Management of the Senate Comm. on Governmental Affairs, 101st Cong. 86 (1989) (statement of Assistant Attorney General William P. Barr); Administrative Dispute Resolution Act: Hearings on H.R. 2497 Before the Subcomm. on Admin. Law and Gov't Relations of the House Comm. on the Judiciary, 101st Cong. 38 (1990) (statement of Assistant Attorney General William P. Barr). In addition, the Civil Division has issued a manual entitled Guidance on the Use of Alternative Dispute Resolution for Litigation in the Federal Courts (1992). That manual asserted that "[t]he Government cannot enter into agreements to participate in 'binding' arbitration." Id. at 4. The legal basis cited for this assertion was the Appointments Clause. Id. at 4 & n.8.

Reg. 55,195 (1991). That order forbids litigation counsel for federal agencies from seeking or agreeing to enter into binding arbitration. *Id.* § 1(c)(3). Therefore, while a constitutionally valid statute may compel litigation counsel to enter into binding arbitration, litigation counsel may not voluntarily agree to binding arbitration.[3]

## I. Background

Neither term in the phrase "binding arbitration" bears a settled meaning. First, "arbitration" may be a very different exercise in different contexts and cases because there are no universally applicable rules of practice, procedure, or evidence governing the conducting of arbitration. In addition, there is no standard as to whether arbitration is to be conducted by a single arbitrator or by a panel of arbitrators or as to the method for selecting the individuals who serve in that capacity.[4] Moreover, arbitration may be voluntary — in that both parties have agreed to resolve their dispute by this method — or compulsory — in that some other requirement such as a statute compels the parties to resolve their dispute by this method. Second, it is not at all clear what exactly is meant by referring to an arbitration as "binding." We take this to mean that judicial review of the arbitral decision is narrowly limited, as opposed to non-binding arbitration in which each party remains free to disregard any arbitral ruling. The limitation on judicial review could take numerous forms. It may mean that there is to be no review of an arbitral decision. Alternatively, it may mean that an arbitral decision is reviewable only under a very limited standard, such as fraud by the arbitrator(s) or arbitrary and capricious decision making. Because of this indeterminacy, it is

---

[3] The President's power is at its lowest ebb where the President issues an executive order that is contrary to other law. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). For this reason, we doubt that Exec. Order No. 12778 is meant to forbid entering into binding arbitration where there is a statutory or other legal obligation to do so. So, for instance, if the Federal Arbitration Act, 9 U.S.C. §§ 1–6 were to require the enforcement of a contractual binding arbitration provision, we would not interpret Exec. Order No. 12778 as attempting to override this statute.

Because your request focuses on the constitutional issues that might arise in connection with binding arbitration, we do not regard it as necessary to determine whether, setting aside Exec. Order No. 12778, the executive is authorized to enter into binding arbitration as part of a contract. Nevertheless, we point out that the President and the executive branch have broad authority to negotiate for or agree to contractual terms that they view as advancing the federal government's various interests. In a given case, this authority may stem from the Constitution, the specific statute authorizing the President or an executive branch official to enter into a contract, or from a broader statutory authorization. *See generally* 40 U.S.C. § 486; *Authority to Issue Executive Order on Government Procurement*, 19 Op. O.L.C. 90 (1995).

Another threshold inquiry is whether there is a basis for bringing a claim against the government. The United States is immune from suit except where it consents to be sued. *See, e.g., United States v. Lee*, 106 U.S. 196 (1882); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 411–12 (1821). The waiver of sovereign immunity must be express. *See, e.g., Department of Energy v. Ohio*, 503 U.S. 607 (1992). Moreover, only Congress may waive sovereign immunity; the executive may not waive this immunity, such as through consenting to binding arbitration. *See United States v. Shaw*, 309 U.S. 495, 501 (1940). The three most significant statutory waivers of sovereign immunity are the Administrative Procedures Act, 5 U.S.C. § 702, the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, and the Tucker Act, 28 U.S.C. §§ 1346(a), 1491. Whether any claim is encompassed within one of these or any other express waiver of sovereign immunity depends upon the specific claim asserted.

[4] Typically, arbitrators either are professional arbitrators or possess some expertise in the subject matter of the specific arbitration wherein they act. Throughout this memorandum, we assume that they are selected to arbitrate particular disputes on a case-by-case basis in the manner of independent contractors.

not possible to draw many specific conclusions. We are able, however, to offer generalizations and guidance pertaining to participation by the federal government in the various forms that binding arbitration may take.

## II. The Appointments Clause

### A. Whether Arbitrators Are Officers of the United States

To understand why the assertion that the Appointments Clause prohibits the government from entering into binding arbitration is not well-founded, it is necessary first to examine the requirements of the Appointments Clause itself. The Appointments Clause provides that

> [the President,] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. The Appointments Clause sets forth the exclusive mechanisms by which an officer of the United States may be appointed. *See Buckley v. Valeo*, 424 U.S. 1, 124–37 (1976) (per curiam). The first issue to be resolved is, who is an "officer" within the meaning of the Constitution and therefore must be appointed by one of the methods set out in the Appointments Clause?

Not everyone who performs duties for the federal government is an officer within the meaning of the Appointments Clause. The requirements of the Appointments Clause apply only where an individual is appointed to an "office" within the federal government. From the early days of the Republic, the concepts of "office" and "officer" have been understood to embrace the ideas of "tenure, duration, emolument, and duties." *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1867). Because *Hartwell* has long been taken as the leading statement of the constitutional meaning of "officer,"[5] that statement is worth repeating in full:

---

[5] In an opinion discussing an Appointments Clause issue, Attorney General Robert F. Kennedy referred to *Hartwell* as providing the "classical definition pertaining to an officer." *Communications Satellite Corporation*, 42 Op. Att'y Gen. 165, 169 (1962). *Hartwell* itself cited several earlier opinions, including *United States v. Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823) (No. 15,747) (Marshall, Circuit Justice), *see Hartwell*, 73 U.S. at 393 n.†, and in turn has been cited by numerous subsequent Supreme Court decisions, including *United States v. Germaine*, 99 U.S. 508, 511–12 (1878), and *Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890). These latter two decisions were cited with approval by the Court in *Buckley*, 424 U.S. at 125–26 & n.162.

> An office is a public station, or employment, conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument, and duties.

> The employment of the defendant was in the public service of the United States. He was appointed pursuant to law, and his compensation was fixed by law. Vacating the office of his superior would not have affected the tenure of his place. His duties were continuing and permanent, not occasional or temporary. They were to be such as his superior in office should prescribe.

> A government office is different from a government contract. The latter from its nature is necessarily limited in its duration and specific in its objects. The terms agreed upon define the rights and obligations of both parties, and neither may depart from them without the assent of the other.

*Id.* at 393.

*Hartwell* and the cases following it specify a number of criteria for identifying those who must be appointed as constitutional officers, and in some cases it is not entirely clear which criteria the court considered essential to its decision. Nevertheless, we believe that from the earliest reported decisions onward, the constitutional requirement has involved at least three necessary components. The Appointments Clause is implicated only if there is created or an individual is appointed to (1) a position of employment (2) within the federal government (3) that is vested with significant authority pursuant to the laws of the United States.

*1. A Position of Employment: The Distinction between Appointees and Independent Contractors.* An officer's duties are permanent, continuing, and based upon responsibilities created through a chain of command rather than by contract. Underlying an officer is an "office," to which the officer must be appointed. As Chief Justice Marshall, sitting as circuit justice, wrote: "Although an office is 'an employment,' it does not follow that every employment is an office. A man may certainly be employed under a contract, express or implied, to do an act, or perform a service, without becoming an officer." *Maurice*, 26 F. Cas. at 1214. Chief Justice Marshall speaks here of being "employed under a contract"; in modern terminology the type of non-officer status he is describing is usually referred to as that of independent contractor. In *Hartwell*, this distinction shows up in the opinion's attention to the characteristics of the defendant's employment being "continuing and permanent, not occasional or temporary," as well as to the suggestion that with respect to an officer, a superior can fix and then change the specific set of duties, rather than having those duties fixed by a contract. 73 U.S. at 393.

The Court also addressed the distinction between employees and persons whose relationship to the government takes some other form in *Germaine*. There, the Court considered whether a surgeon appointed by the Commissioner of Pensions " 'to examine applicants for pension, where [the Commissioner] shall deem an examination . . . necessary,' " *Germaine*, 99 U.S. at 508 (quoting Rev. Stat. § 4777), was an officer within the meaning of the Appointments Clause. The surgeon in question was "only to act when called on by the Commissioner of Pensions in some special case"; furthermore, his only compensation from the government was a fee for each examination that he did in fact perform. *Id.* at 512. The Court stated that the Appointments Clause applies to "all persons who can be said to hold an office under the government," *id.* at 510, and, applying *Hartwell*, concluded that "the [surgeon's] duties are not continuing and permanent and they are occasional and intermittent." *Id.* at 512. The surgeon, therefore, was not an officer of the United States. *Id.*[6]

*2. Appointment to a Position within the Federal Government.* In addition, *Hartwell* and the other major decisions defining "Officers of the United States" all reflect the historical understanding that the Appointments Clause speaks only to positions within the federal government. The Appointments Clause simply is not implicated when significant authority is devolved upon non-federal actors. In *Hartwell* the Court stated that "[a]n office is a public station, or employment, conferred by the appointment of government." 73 U.S. at 393. In holding that the Appointments Clause applied in that case, the Court stressed that "[t]he employment of the defendant was in the public service of the United States." *Id.; see also Germaine*, 99 U.S. at 510 (founders intended appointment pursuant to the Appointments Clause only for "persons who can be said to hold an office under the government about to be established under the Constitution"). This means that the delegation of federal authority to state officials can present no Appointments Clause difficulties, because the individuals serve as state officials rather than as federal officials.[7] It is a conceptual mistake to argue that federal

---

[6] *Germaine* clearly was discussing the concept of "officer" in the constitutional, and not simply a generic, sense: the alternative basis for the holding was that the surgeon was not an officer because he was appointed by the Commissioner who, as the head of a bureau within the Interior Department, could not be a "head of Department," with the authority to appoint officers. *Id.* at 511.

[7] The framers appear to have envisioned that state officials would enforce federal law. For example, Madison wrote,

eventual collection [of certain Federal taxes] under the immediate authority of the Union, will generally be made by the officers, and according to the rules, appointed by the several States. Indeed it is extremely probable that in other instances, . . . the officers of the States will be clothed with the correspondent authority of the Union.

laws delegating authority to state officials create federal "offices," which are then filled by (improperly appointed) state officials. Rather, the "public station, or employment" has been created by state law; the federal statute simply adds federal authority to a pre-existing state office.[8] Accordingly, the substantiality of the delegated authority is immaterial to the Appointments Clause conclusion.[9] An analogous point applies to delegations made to private individuals: the simple assignment of some duties under federal law, even significant ones, does not by itself pose an Appointments Clause problem.[10]

In our view, therefore, the lower federal courts have been correct in rejecting Appointments Clause challenges to the exercise of federally-derived authority by state officials,[11] the District of Columbia City Council,[12] *qui tam* relators under the False Claims Act,[13] and plaintiffs under the citizen suit provisions of the Clean

*The Federalist No. 45*, at 292 (James Madison) (Clinton Rossiter ed., 1961). The framers also seem to have acted upon this understanding. The first Judiciary Act, enacted by the first Congress, required state magistrates and justices of the peace to arrest and detain any criminal offender under the laws of the United States. Ch. XX, §33, 1 Stat. 73, 91 (1789). This statute, in immaterially modified form, remains in effect. 18 U.S.C. §3041. At least two courts have interpreted this statute to authorize state and local law enforcement officers to arrest an individual who violates federal law. *See United States v. Bowdach*, 561 F.2d 1160 (5th Cir. 1977); *Whitlock v. Boyer*, 77 Ariz. 334, 271 P.2d 484 (1954).

As discussed below, the delegation to private persons or non-federal government officials of federal-law authority, sometimes incorrectly analyzed as raising Appointments Clause questions, can raise genuine questions under other constitutional doctrines, such as the non-delegation doctrine and general separation of powers principles. *Compare Confederated Tribes of Siletz Indians v. United States*, 841 F. Supp. 1479, 1486–89 (D. Or. 1994) (appeal pending) (confusing Appointments Clause with separation of powers analysis in holding invalid a delegation to a state governor) with *United States v Ferry County*, 511 F. Supp. 546, 552 (E.D. Wash. 1981) (correctly dismissing Appointments Clause argument and analyzing delegation to county commissioners under non-delegation doctrine).

[8] This should be distinguished from the case where a federal statute creates a federal office — such as membership on a federal commission that wields significant authority — and requires that a particular state officer occupy that office. In this instance, Congress has actually created a federal office and sought to fill it, which is the prototype of an Appointments Clause violation.

[9] *See Seattle Master Builders Ass'n v. Pacific Northwest Elec. Power & Conservation Planning Council*, 786 F.2d 1359, 1365 (9th Cir. 1986) ("because the Council members do not serve pursuant to federal law," it is "immaterial whether they exercise some significant executive or administrative authority over federal activity"), *cert. denied*, 479 U.S. 1059 (1987).

[10] One might also view delegations to private individuals as raising the same considerations as suggested by the distinction drawn earlier between appointee and independent contractor — so long as the statute does not create such tenure, duration, emoluments and duties as would be associated with a public office, the individual is not the occupant of a constitutional office but is, rather, a private party who has assumed or been delegated some federal responsibilities.

[11] *See, e.g., Seattle Master Builders*, 786 F.2d at 1364–66. The particular state officials at issue were serving on an entity created by an interstate compact established with the consent of Congress, but that fact is not significant for Appointments Clause purposes. The crucial point was that "[t]he appointment, salaries and direction" of the officials were "state-derived": "the states ultimately empower the [officials] to carry out their duties." *Id.* at 1365. The Supreme Court's decision in *New York v. United States*, 505 U.S. 144 (1992), which held that Congress cannot "commandeer" state officials to serve federal regulatory purposes, reinforces this conclusion. Where state officials do exercise significant authority under or with respect to federal law, they do so *as state officials*, by the decision and under the ultimate authority of the state.

[12] *See Techworld Dev. Corp. v. D.C. Preservation League*, 648 F. Supp. 106, 115–17 (D.D.C. 1986). Though the court did not fully develop the point, we believe that the District of Columbia stands on a special footing. Congress's plenary authority to legislate for the District entails authority to establish a municipal government for the District, the officers of which are municipal rather than federal officers to whom the Appointments Clause simply does not apply.

[13] We believe that *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 757–59 (9th Cir. 1993) (rejecting Appointments Clause challenge to False Claims Act), *cert. denied*, 510 U.S. 1140 (1994), reached the correct result but

Continued

Water Act.[14] The same conclusion should apply to the members of multinational or international entities who are not appointed to represent the United States.[15]

3. The Exercise of Significant Authority. Chief Justice Marshall's observation that "[a]lthough an office is 'an employment,' it does not follow that every employment is an office," *Maurice*, 26 F. Cas. at 1214, points to a third distinction as well — although not one that was at issue in *Maurice* itself. An officer is distinguished from other full-time employees of the federal government by the extent of authority he or she can properly exercise. As the Court expressed in *Buckley*:

> We think that the term "Officers of the United States" as used in Art. II, defined to include "all persons who can be said to hold an office under the government" in *United States v. Germaine*, [means] that any appointee exercising *significant authority* pursuant to the laws of the United States . . . must . . . be appointed in the manner prescribed by [the Appointments Clause].

424 U.S. at 125–26 (emphasis added).[16] In contrast, "[e]mployees are lesser functionaries subordinate to officers of the United States." *Id.* at 126 n.162.

---

through an incorrect line of analysis. *See id.* at 758 (Clause not violated because of the relative modesty of the authority exercised by the relator). The better Appointments Clause analysis, in our view, is that of the court in *United States ex rel. Burch v. Piqua Eng'g, Inc.*, 803 F. Supp. 115, 120 (S.D. Ohio 1992), which held that "because *qui tam* [relators] are not officers of the United States, the FCA does not violate the Appointments Clause." We disapprove the Appointments Clause analysis and conclusion of an earlier memorandum of this Office, *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207 (1989) (arguing that the qui tam provisions violate the Appointments Clause).

[14] Here, the court phrased its analysis in terms of separation of powers, but the challenge to the statute was, at its core, based on the Appointments Clause. *See Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 652 F. Supp. 620, 624 (D. Md. 1987) (*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), "does not stand for the proposition . . . that private persons may not enforce any federal laws simply because they are not Officers of the United States appointed in accordance with Article II of the Constitution").

[15] At least where these entities are created on an ad hoc or temporary basis, there is a long historical pedigree for the argument that even the United States representatives need not be appointed in accordance with Article II. *See, e.g.*, Alexander Hamilton, *The Defence* No. 37 (Jan. 6, 1796), *reprinted in* 20 *The Papers of Alexander Hamilton* 13, 20 (Harold C. Syrett ed., 1974):

> As to what respects the Commissioners agreed to be appointed [under the Jay Treaty with Great Britain], they are not in a strict sense OFFICERS. They are *arbitrators* between the two Countries. Though in the Constitutions, both of the U[nited] States and of most of the Individual states, a particular mode of appointing officers is designated, yet in practice it has not been deemed a violation of the provision to appoint Commissioners or special Agents for special purposes in a different mode.

The traditional view of the Attorneys General has been that the members of international commissions hold "an office or employment emanating from the general treaty-making power, and created by it" and the foreign nation(s) involved and that members are not constitutional officers. *Office—Compensation*, 22 Op. Att'y Gen. 184, 186 (1898); *see generally Dames & Moore v. Regan*, 453 U.S. 654 (1981); Harold H. Bruff, *Can Buckley Clear Customs?*, 49 Wash. & Lee L. Rev. 1309 (1992); Jim C. Chen, *Appointments with Disaster: The Unconstitutionality of the Binational Arbitral Review under the United States-Canada Free Trade Agreement*, 49 Wash. & Lee L. Rev. 1455 (1992); William J. Davey, *The Appointments Clause and International Dispute Settlement Mechanisms: A False Conflict*, 49 Wash. & Lee L. Rev. 1315 (1992); Alan B. Morrison, *Appointments Clause Problems in the Dispute Resolution Provisions of the United States-Canada Free Trade Agreement*, 49 Wash. & Lee L. Rev. 1299 (1992).

[16] *See Appointments in the Department of Commerce and Labor*, 29 Op. Att'y Gen. 116, 118–19, 122–23 (1911) (official authorized to perform all the duties of the Commissioner of Fisheries, who was appointed by the President and confirmed by the Senate, was an officer; scientists, technicians, and superintendent of mechanical plant in the

The distinction between constitutional officers and other employees is a long-standing one. *See, e.g., Burnap v. United States,* 252 U.S. 512, 516–19 (1920) (landscape architect in the Office of Public Buildings and Grounds was an employee, not an officer); *Second Deputy Comptroller of the Currency—Appointment,* 26 Op. Att'y Gen. at 628 (Deputy Comptroller of the Currency was "manifestly an officer of the United States" rather than an employee). At an early point, the Court noted the importance of this distinction for Appointments Clause analysis. *See Germaine,* 99 U.S. at 509.[17]

The Supreme Court relied on the officer/employee distinction in *Freytag v. Commissioner,* 501 U.S. 868 (1991). In *Freytag,* the Court rejected the argument that special trial judges of the Tax Court are employees rather than officers because "they lack authority to enter a final decision" and thus arguably are mere subordinates of the regular Tax Court judges.[18] *Id.* at 881. The Court put some weight on the fact that the position of special trial judge, as well as its duties, salary, and mode of appointment, are specifically established by statute;[19] the Court also emphasized that special trial judges "exercise significant discretion" in carrying out various important functions relating to litigation in the Tax Court. *Id.* at 882.

---

Bureau of Standards were employees rather than officers), *Second Deputy Comptroller of the Currency—Appointment,* 26 Op. Att'y Gen. 627, 628 (1908) ("The officer is distinguished from the employee in the greater importance, dignity, and independence of his position"; official authorized to exercise powers of the Comptroller of the Currency in the absence of the Comptroller was clearly an officer).

We hasten to note that the exercise of significant authority alone is not a sufficient condition to characterizing a position as an office within the meaning of the Appointments Clause. To be considered a position that must be filled in conformance with the Appointments Clause, the position must also be one of employment within the federal government. For a discussion of this point, *see infra* section II.B.

[17] The status of certain officials traditionally appointed in modes identical to those designated by the Appointments Clause is somewhat anomalous. For instance, low-grade military officers have always been appointed by the President and confirmed by the Senate and understood to be "Officers of the United States" in the constitutional sense; in *Weiss v. United States,* 510 U.S. 163, 171 (1994), the Supreme Court recently indicated its agreement with that understanding. It is at least arguable, however, that the authority exercised by second lieutenants and ensigns is so limited and subordinate that their analogues in the civil sphere clearly would be employees. There are at least three possible explanations. (1) Congress may make anyone in public service an officer simply by requiring appointment in one of the modes designated by the Appointments Clause. The Clause, on this view, mandates officer status for officials with significant governmental authority but does not restrict the status to such officials. This apparently was the nineteenth-century view. *See, e.g., United States v. Perkins,* 116 U.S. 483, 484 (1886) (cadet engineer at the Naval Academy was an officer because "Congress has by express enactment vested the appointment of cadet-engineers in the Secretary of the Navy and when thus appointed they become officers and not employe[e]s"). (2) Certain officials are constitutional officers because in the early Republic their positions were of greater relative significance in the federal government than they are today. *Cf. Buckley,* 424 U.S. at 126 (postmasters first class and clerks of district courts are officers). (3) Even the lowest ranking military or naval officer is a potential commander of United States armed forces in combat — and, indeed, is in theory a potential commander of large military or naval units by presidential direction or in the event of catastrophic casualties among his or her superiors.

[18] In fact, as the Court pointed out, the chief judge of the Tax Court can assign special trial judges to render *final* decisions in certain types of cases, a power that the government conceded rendered them, in those circumstances, "inferior officers who exercise independent authority." The Court rejected the argument that special trial judges could be deemed inferior officers for some purposes and employees for others. *Id.* at 882.

[19] The text of the Appointments Clause implies that offices in the sense of the Clause must be established in the Constitution or by statute. *See* U.S. Const. art. II, §2, cl. 2 (specifying certain officers and then referring to "all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law").

In contrast, as this Office has concluded, the members of a commission that has purely advisory functions "need not be officers of the United States" because they "possess no enforcement authority or power to bind the Government." *Proposed Commission on Deregulation of International Ocean Shipping*, 7 Op. O.L.C. 202, 202–03 (1983). For that reason, the creation by Congress of presidential advisory committees composed, in whole or in part, of congressional nominees or even of members of Congress does not raise Appointments Clause concerns.

Because employees do not wield independent discretion and act only at the direction of officers, they do not in their own right "exercis[e] responsibility under the public laws of the Nation," *Buckley*, 424 U.S. at 131.[20] Conversely, "any appointee" in federal service who "exercis[es] significant authority pursuant to the laws of the United States" must be an officer in the constitutional sense and must be appointed in a manner consistent with the Appointments Clause.[21] *Id.* at 126.

To recapitulate, one who occupies a *position of employment within the federal government* that carries *significant authority* pursuant to the laws of the United States is required to be an officer of the United States, and therefore to be appointed pursuant to the Appointments Clause. Each one of the italicized terms signifies an independent condition, all three of which must be met in order for the position to be subject to the requirements of the Appointments Clause. We now turn to consideration of whether arbitrators occupy a position of employment in the federal government and exercise significant federal authority.

*4. Arbitrators.* It seems beyond dispute that arbitrators exercise significant authority, at least in the context of binding arbitration involving the federal government. However, arbitrators retained for purposes of resolving a single case do not satisfy the remaining necessary conditions. They are manifestly private actors who are, at most, independent contractors to, rather than employees of, the federal government. Arbitrators are retained for a single matter, their service expires at the resolution of that matter, and they fix their own compensation. Hence, their service does not bear the hallmarks of a constitutional office — tenure, duration, emoluments, and continuing duties. Consequently, arbitrators do not occupy a position of employment within the federal government, and it cannot be said that they are officers of the United States. Because arbitrators are not officers, the Appointments Clause does not place any requirements or restrictions on the manner in which they are chosen.

---

[20] That an employee may not exercise *independent* discretion does not, of course, mean that his or her duties may not encompass responsibilities requiring the exercise of judgment and discretion under the ultimate control and supervision of an officer. In *Steele v. United States* (No. 2), 267 U.S. 505, 508 (1925), the Supreme Court noted that a "deputy marshal is not in the constitutional sense an officer of the United States," yet "is called upon to exercise great responsibility and discretion" in "the enforcement of the peace of the United States, as that is embraced in the enforcement of federal law." But deputy marshals act at the direction of "the United States marshal under whom they serve," *id.*, who is an officer in the constitutional sense.

[21] *See Appointment and Removal of Inspectors of Customs*, 4 Op. Att'y Gen. 162, 164 (1843) (Congress may not provide for the appointment of "any employe[e], coming fairly within the definition of an inferior officer of the government," except by a mode consistent with the Appointments Clause).

*Auffmordt* compels this conclusion. That case involved a statute that entitled an importer who was dissatisfied with the government's valuation of dutiable goods to demand a reappraisement jointly conducted by a general appraiser (a government employee) and a "merchant appraiser" appointed by the collector of customs for the specific case. Despite the fact that the reappraisement decision was final and binding on both the government and the importer, 157 U.S. at 329, the Court rejected the argument that the merchant appraiser was an "inferior Officer" whose appointment did not accord with the requirements of the Appointments Clause. In describing the merchant appraiser, the Court said:

> He is selected for the special case. He has no general functions, nor any employment which has any duration as to time, or which extends over any case further than as he is selected to act in that particular case. . . . He has no claim or right to be designated, or to act except as he may be designated. . . . His position is without tenure, duration, continuing emolument, or continuous duties . . . . Therefore, he is not an 'officer,' within the meaning of the clause.

*Id.* at 326–27. Not only does *Auffmordt* compel our conclusion, the contrary position — that an independent contractor or non-federal employee who exercises significant governmental authority must be appointed pursuant to the Appointments Clause — would be inconsistent with the *Germaine* and *Hartwell* cases discussed above.[22]

Our conclusion is consistent with the Supreme Court's classification of the independent counsel as an inferior officer in *Morrison v. Olson*, 487 U.S. 654 (1988). There the Court observed that "[i]t is clear that appellant is an 'officer' of the United States, not an 'employee.' " *Id.* at 671 n.12. Significantly, the lone authority the Court cited for this proposition was "*Buckley*, 424 U.S. at 126, and n. 162." *Id.* At the page cited, the *Buckley* Court quoted and reaffirmed *Germaine*, and in the footnote cited the Court reaffirmed both *Germaine* and *Auffmordt*. *Buckley*, 424 U.S. at 126 & n.162. This coupled with *Morrison*'s express approval of *Germaine*, 487 U.S. at 670, strongly counsel against interpreting *Morrison* to have scuttled the *Auffmordt* and *Germaine* definition of office, which treats tenure, duration, emoluments, and continuing duties as necessary conditions.

---

[22] ENRD reads *Auffmordt* and *Germaine* as limited to "judgments of experts on areas within their expertise, as opposed to policy or legal judgments." ENRD memorandum at 3. Apparently, ENRD's position is that the negative inference from the Appointments Clause is to be drawn except where an expert acts within the scope of his or her expertise. In other words, the Appointments Clause prohibits any private actor from exercising significant authority, unless the private actor is an expert who exercises significant authority within the scope of his or her expertise. While there may be strong policy reasons for wishing to restrict *Auffmordt* and *Germaine* in this way, there is no basis in the Constitution for doing so. The text of the Appointments Clause makes no reference to, let alone an exception for, expert action. Furthermore, there is nothing in the *Auffmordt* or *Germaine* opinions themselves that supports narrowing them in this way.

We believe that the factors that make it "clear" that an independent counsel is an officer of the United States demonstrate that an arbitrator is not. The office of independent counsel is created by statute. *See* 28 U.S.C. §§ 591–599. The independent counsel's compensation is fixed specifically by statute at the rate set forth at 5 U.S.C. § 5315 for level IV of the Senior Executive Service. *Id.* § 594(b). All of the others listed as receiving this compensation are in the full-time employment of the federal government and, insofar as we are aware, are in fact officers within the meaning of the Appointments Clause. *See* 5 U.S.C. § 5315 (setting compensation for, inter alia, assistant attorneys general). The independent counsel's operating and overhead expenses are fixed [23] by statute and appropriation. 28 U.S.C. § 594(c) (fixing compensation of attorneys employed by an independent counsel); *id.* § 594(l) (providing for administrative support, office space, and travel expenses). Significantly, Congress is the exclusive source of funding for any operations undertaken by the independent counsel. In this way, Congress takes some part in providing an ongoing definition to the office of independent counsel and may exercise some degree of influence over the independent counsel. Indeed, as the Court noted, Congress expressly retained oversight authority with respect to the activities of independent counsels and provided for submission of reports by independent counsels to congressional oversight committees. *Morrison*, 487 U.S. at 664–65. In addition, the independent counsel occupies a position that is formally within the federal government. That position is, according to the Supreme Court, within the executive branch chain of command to at least some extent and subject to oversight and control by the President and guidance of the Attorney General. *Id.* at 685–92; 28 U.S.C. § 594(e). The independent counsel also may request and receive the assistance of the Department of Justice. *Id.* § 594(d). The independent counsel thus clearly occupies a position of employment within the federal government. In fact, this point was so clear that Congress went out of its way expressly to provide that the position of independent counsel would be "separate from and independent of the Department of Justice" for certain purposes. *Id.* § 594(i).

Arbitrators share none of these material qualities. The position of arbitrator is not created by a congressional enactment. Arbitrators set their own fee and charge the client parties, including but not limited to the government, that fee. No appropriation is made specifically to support the operations or expenses of arbitrators.[24] As a result, an arbitrator's compensation even for a case involving the government is not limited to the fee paid by the government and an arbitrator remains free to turn to other sources for funding of his or her operations and expenses, subject

---

[23] By use of the term "fixed," we mean to distinguish this scheme — in which Congress sets the independent counsel's salary and overhead — from one in which an arbitrator's fee and overhead are determined by the arbitrator and passed on to the federal government, even though the government may ultimately pay them from a specific appropriation.

[24] Of course, any fee that the government pays must ultimately come from appropriated funds. Nevertheless, the fee is paid to an arbitrator not in the manner of an employee of the government but rather as a non-government actor who provides services to the government.

of course to conflict of interest and ethical limitations. In addition, arbitrators are not subject to congressional oversight or to presidential control.

Finally, the statute creating the office of independent counsel also defines the procedures by which the office may be terminated. Morrison, 487 U.S. at 664. Arbitrators, by contrast, serve until the matter they are retained to resolve is completed; there is no statutory process for termination of their "office." This vividly demonstrates that while there is an office underlying the position of independent counsel, there is no similar office underlying one who acts as an arbitrator; there is no process for terminating the office of an arbitrator because there is no office to terminate.

This is not to say that it is impossible for a binding arbitration mechanism to run afoul of the Appointments Clause. As indicated, arbitrators whose sole or collective decisions are binding on the government exercise significant authority. If any such arbitrator were to occupy a position of employment within the federal government, that arbitrator would be required to be appointed in conformity with the Appointments Clause. *See Freytag*, 501 U.S. at 880–82. Thus, if a federal agency were to conduct binding arbitrations and to employ arbitrators whom it provided with all relevant attributes of an office, all such arbitrators would be required to be appointed in conformity with the Appointments Clause.

## B. The Appointments Clause as a Bar against Delegations to Private Actors

We do not understand there to be any dispute that arbitrators are private rather than government actors. *See Davey, supra*, at 1318 ("no one would argue that [arbitrators] are" officers of the United States). Instead, the position that the Appointments Clause prohibits the government from entering into binding arbitration rests on a negative inference drawn from the Appointments Clause — specifically, that only officers of the United States appointed pursuant to the Appointments Clause may exercise significant federal authority. *See, e.g.*, Civil Division, U.S. Dep't of Justice, *Guidance on the Use of Alternative Dispute Resolution for Litigation in the Federal Courts* 4 n.8 (1992) ("Under the Appointments Clause, [significant governmental] duties may be performed only by 'Officers of the United States,' appointed in the constitutionally prescribed manner." (citation omitted)). This negative inference lacks textual support and is contrary to the consistent interpretations of the Clause by the Supreme Court.

By its own terms, the Appointments Clause addresses only the permissible methods by which officers may be appointed. The term officer has been defined to mean one who occupies a position of employment within the federal government that carries significant authority pursuant to the laws of the United States. The Appointments Clause's text says nothing about whether or what limits exist on the government's power to devolve authority on private or other non-federal actors.

Instead, what limits exist on the ability to delegate governmental authority to private actors are encompassed within the non-delegation doctrine.[25] The very existence of the non-delegation doctrine strongly suggests that looking to the Appointments Clause for limits on the federal government's ability to delegate authority to non-federal actors is a misguided enterprise. If the Appointments Clause prohibited all delegations of significant federal governmental authority to non-federal actors, there would be no need for a separate non-delegation doctrine in that context. While some of the most notable controversies under the non-delegation doctrine have involved delegations from the federal legislature to the federal executive, *see, e.g., Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212 (1989); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935), the doctrine has by no means been limited to this context. The Supreme Court and the lower federal courts have reviewed the delegation of significant federal governmental authority to non-federal actors under the non-delegation doctrine. Moreover, the courts, including the Supreme Court, have upheld such delegations without even hinting that the Appointments Clause might be implicated. *See, e.g., Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985) (upholding delegation to private arbitrators); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) (upholding delegation of regulatory authority to private industry group); *Kentucky Horseman's Benevolent & Protective Ass'n v. Turfway Park Racing Ass'n*, 20 F.3d 1406 (6th Cir. 1994) (upholding delegation of regulatory authority to a state and to private industry group); *Nance v. EPA*, 645 F.2d 701 (9th Cir. 1981) (upholding delegation of authority under Clean Air Act to Indian tribe); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690 (3d Cir. 1979) (upholding delegation of adjudicative authority to private industry group); *Crain v. First Nat'l Bank*, 324 F.2d 532, 537 (9th Cir. 1963) ("While Congress cannot delegate to private corporations or anyone else the power to enact laws, it may employ them in an administrative capacity to carry them into effect."); *cert. denied*, 454 U.S. 108 (1981); *R.H. Johnson & Co. v. SEC*, 198 F.2d 690 (2d Cir.) (upholding delegation of adjudicative authority to private industry group), *cert. denied*, 344 U.S. 855 (1952).[26]

The Supreme Court's interpretations of the Appointments Clause actually refute the negative inference that is sometimes asserted. The Court's decision in *Auffmordt* is especially compelling. There, the Court held that because the mer-

---

[25] The application of the non-delegation doctrine to binding arbitration is discussed more fully *infra* at section V.C.

[26] It is theoretically possible that the courts have upheld these delegations because the parties challenging them have repeatedly failed to raise the Appointments Clause. *Compare White v. Massachusetts Council of Constr. Employers*, 460 U.S. 204 (1983) (upholding residency requirement for public works project against dormant Commerce Clause challenge) *with United Bldg. and Constr. Trades v. Camden*, 465 U.S. 208 (1984) (striking down residency requirement for public works projects as violation of Privileges and Immunities Clause). We would be reluctant to place the numerous delegations so upheld on such a capricious footing absent a clear indication in the Court's Appointments Clause jurisprudence. While not all non-delegation litigants have raised Appointments Clause challenges, some have and, as we detailed in the preceding section, those challenges consistently have been rejected.

chant appraiser—who stands formally and functionally in the same position as an arbitrator in a binding arbitration involving the federal government—was a private actor, the Appointments Clause did not apply and so upheld the statutory delegation of arbitral authority to the merchant appraiser. In other words, *Auffmordt* held that the Appointments Clause does not prohibit delegating significant federal authority to private actors. The Court employed the same reasoning to reject the Appointments Clause challenges in *Germaine* and *Hartwell*.

The argument asserting the negative inference from the Appointments Clause relies on *Buckley*. We believe, however, that under its best reading *Buckley* reflects and endorses our view that the Appointments Clause simply does not apply to non-federal actors, and that the negative inference argument misreads the opinion. First, *Buckley* cites both *Germaine* and *Auffmordt* approvingly. *See* 424 U.S. at 125–26 & n.162. Second, in several of its statements of the definition of "officers," *Buckley*, sometimes citing *Germaine* explicitly, says that the term applies to *appointees* or *appointed officials* who exercise significant authority under federal law, thus recognizing the possibility that non-appointees might sometimes exercise authority under federal law. *See, e.g., id.* at 131 ("Officers" are "all appointed officials exercising responsibility under the public laws.").

It is true that, at other points in its opinion, the *Buckley* Court used language that, taken in isolation, might suggest that the Appointments Clause applies to persons who, although they do not hold positions in the public service of the United States, exercise significant authority pursuant to federal law. *See id.* at 141. However, we think such a reading of *Buckley* is unwarranted. So understood, *Buckley* must be taken to have overruled, *sub silentio*, *Germaine* and *Auffmordt*— cases upon which it expressly relies in its analysis, *see id.* at 125–26 & n.162— and its repeated quotation of the *Germaine* definition of "officer" as "all persons who can be said to hold an office under the government" would make no sense. Not only does such a reading render *Buckley* internally inconsistent, it fails to explain the Supreme Court's continuing and unqualified citations to and reliance upon *Germaine. See Freytag*, 501 U.S. at 881; *Morrison*, 487 U.S. at 672.

The apparently unlimited language of some passages in *Buckley* has a simpler explanation: there was no question that the officials at issue in *Buckley* held positions of "employment" under the federal government, and thus the question of the inapplicability of the Appointments Clause to persons not employed by the federal government was not before the Court.[27] The post-*Buckley* Supreme Court

---

[27] The weight of scholarship that has considered the interplay of *Buckley* with *Hartwell, Germaine,* and *Auffmordt* accords with our approach. As one commentator has asserted:

> The *Buckley* Court's entire analysis is predicated upon its construction of the appointments clause in the context of its 'cognate' separation-of-powers provisions. The decision, as in *Germaine* and the other appointments clause cases, was concerned with determining the status of an individual who was employed by the United States. The Court's definition thus was employed to distinguish between classes of federal employees; it was not used to distinguish between federal and nonfederal employees. Since the two questions differ radically, it is hardly surprising that a standard helpful in resolving one leads to absurd results when applied to the other.

Continued

221

has often assessed the validity of statutes that would starkly pose Appointments Clause issues if, in fact, the Court had adopted the position that wielding significant authority pursuant to the laws of the United States, without more, requires appointment in conformity with that Clause. In none of these cases has the Court even hinted at the existence of an Appointments Clause issue. It is especially telling that two of these decisions have involved forms of binding arbitration. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985) (upholding statutory requirement that registrants under a federal regulatory scheme submit to binding arbitration conducted by a panel of arbitrators who are not appointed by one of the methods specified in the Appointments Clause and are subject only to limited judicial review); *Schweiker v. McClure*, 456 U.S. 188 (1982) (upholding submission of dispute to binding, unreviewable determination by a single arbiter who is a private actor); *see also FERC v. Mississippi*, 456 U.S. 742 (1982) (upholding requirement that states enforce federal regulatory scheme relating to utilities); *Lake Carriers' Ass'n v. Kelley*, 456 U.S. 985 (1982) (mem.), *aff'g* 527 F. Supp. 1114 (E.D. Mich. 1981) (three-judge panel) (upholding statute that granted states authority to ban sewage emissions from all vessels); *Train v. National Resources Defense Council, Inc.*, 421 U.S. 60 (1975) (construing provision of Clean Air Act that gave states authority to devise and enforce plans for achieving congressionally defined, national air quality standards).[28] The Supreme Court's decision in *Buckley*, we conclude, did not modify the long-settled principle that a person who is not an officer under *Hartwell* need not be appointed pursuant to the Appointments Clause.

Prior writings of this Office have read *Buckley* more broadly as standing for the proposition disavowed here — that is, that all persons exercising significant federal authority, by virtue of that fact alone, must be appointed pursuant to the Appointments Clause. We are aware of four instances in which our disagreement with this understanding of *Buckley* would cause us to reach a different conclusion on the Appointments Clause question presented. *See Constitutionality of Subsection 4117(b) of Enrolled Bill H.R. 5835, the "Omnibus Budget Reconciliation Act of 1990,"* 14 Op. O.L.C. 154, 155 (1990) (statutory scheme under which congressional delegations and physicians' organizations of certain states exercise

---

Dale D. Goble, *The Council and the Constitution: An Article on the Constitutionality of the Northwest Power Planning Council*, 1 J. Envtl. L. & Litig. 11, 53 (1986); *see also* Harold J. Krent, *Fragmenting the Unitary Executive: Congressional Delegations of Administrative Authority Outside the Federal Government*, 85 Nw. U. L. Rev. 62, 72–73 n.26 (1990) (whether one who exercises governmental authority is an officer is determined by looking to the factors set out in *Hartwell, Germaine*, and *Auffmordt*).

[28] It is sometimes asserted that the Supreme Court in *Bowsher v. Synar*, 478 U.S. 714 (1986), adopted the negative inference from the Appointments Clause. We see no basis for this proposition. That case simply did not involve the Appointments Clause. While the Court makes a passing reference to the Appointments Clause, *id.* at 722–23, we can find no passage in which the Court even appears to contemplate construing the Appointments Clause. The question in *Bowsher* pertained to the limits on the authority that the Comptroller General could exercise. The Comptroller General is appointed by the President and confirmed by the Senate, *see* 31 U.S.C. § 703. This method of appointment conforms to the letter of the Appointments Clause. *See* U.S. Const. art. II, § 2, cl. 2. We cannot conceive of a reasonable reading of *Bowsher* as either explicitly or implicitly affirming — or, for that matter, rejecting — the negative inference from the Appointments Clause.

"significant authority" violates Appointments Clause); *Constitutionality of the Qui Tam Provisions of the False Claims Act,* 13 Op. O.L.C. 207, 222 (1989) (provisions of False Claims Act authorizing qui tam suits by private parties violate Appointments Clause because qui tam relators exercise "significant governmental power"); *Representation of the United States Sentencing Commission in Litigation,* 12 Op. O.L.C. 18, 26–28 (1988) (private party acting as counsel for United States agency must be appointed pursuant to Appointments Clause); *Proposed Legislation to Establish the National Indian Gaming Commission,* 11 Op. O.L.C. 73, 74 (1987) (Appointments Clause problems raised where state and local officials given authority to waive federal statute). We now disavow the Appointments Clause holdings of those precedents. To the extent that our reading of *Buckley* is inconsistent with the Appointments Clause reasoning of other prior precedents of this office, that reasoning is superseded. *See Common Legislative Encroachments on Executive Branch Authority,* 13 Op. O.L.C. 248, 248–49 (1989). We do not disavow these precedents lightly. These more recent citations, however, are inconsistent and in some cases irreconcilable with prior opinions of the Attorneys General. Moreover, the Supreme Court has not overruled but has reaffirmed *Auffmordt, Hartwell,* and *Germaine,* and we are bound to follow them.

## III. The Take Care Clause

It has been suggested that the Take Care Clause prohibits the federal government from entering into binding arbitration, because that clause requires all power exercised by the executive branch to be exercised in a manner that the President judges to be "faithful." This approach forbids the President's judgment from being subordinated to the judgment of an arbitrator. This suggestion misconstrues the Take Care Clause. The Constitution establishes that "[t]he executive power shall be vested in a President of the United States of America," U.S. Const. art. II, § 1, cl. 1; and that the President "shall take Care that the Laws be faithfully executed," *id.* art. II, § 3. The Supreme Court and the Attorneys General have long interpreted the Take Care Clause as standing for the proposition that the President has no inherent constitutional authority to suspend the enforcement of the laws, particularly of statutes. *See, e.g., INS v. Chadha,* 462 U.S. 919, 953 n.16 (1983); *Kendall v. United States ex rel. Stokes,* 37 U.S. (12 Pet.) 524, 609– 13 (1838); *The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation,* 4A Op. O.L.C. 55, 59 (1980) (opinion of Attorney General Civiletti) ("The President has no 'dispensing power.'"). *See generally* Christopher N. May, *Presidential Defiance of "Unconstitutional" Laws: Reviving the Royal Prerogative,* 21 Hastings Const. L.Q. 865, 869–74 (1994).

The Supreme Court's decision in *Kendall* is illuminating. A dispute between the postmaster general and several contractors had arisen. Congress passed a law directing the Solicitor of the Department of the Treasury to resolve the dispute

and requiring the postmaster general to pay whatever sum the Solicitor determined was due. The postmaster general refused to comply with the Solicitor's decision, arguing that he "was alone subject to the direction and control of the President, with respect to the execution of the duty imposed upon him by this law; and this right of the President is claimed, as growing out of the obligation imposed upon him by the constitution, to take care that the laws be faithfully executed." 37 U.S. at 612. The Court emphatically rejected this argument.[29] Instead the Court ruled that the Congress had waived sovereign immunity and submitted to whatever resolution the Solicitor ordered. "The terms of the submission was a matter resting entirely in the discretion of congress; and if they thought proper to vest such a power in *any one*, and especially as the arbitrator was an officer of the government, it did not rest with the postmaster general to control congress, or the solicitor, in that affair." *Id.* at 611 (emphasis added). Thus, *Kendall* stands for the proposition that the Executive must comply with the terms of valid statutes and that if a statute requires the Executive to submit to binding arbitration, the Executive must do so.

The Take Care Clause itself has no bearing on the question of whether the Constitution permits the federal government to enter into binding arbitration; in this context, it simply requires the President to "take Care" that whatever valid legal requirements might exist are followed.[30] It is necessary to consider the application of this principle in three situations. First, where a statute or other law operates to require the government to submit to binding arbitration, the government must submit. *Kendall*, 37 U.S. at 611. Second, where a statute or other law forbids submission to binding arbitration, such as where it expressly vests discretion in a particular government officer, submission to binding arbitration is forbidden. *See Establishment of a Labor Relations System for Employees of the Federal Labor Relations Authority*, 4B Op. O.L.C. 709, 715–16 (1980).[31] Finally, where the statutes and other laws are silent, the Take Care Clause simply has nothing to say about whether the government may submit to binding arbitration.

---

[29] "This is a doctrine that cannot receive the sanction of this court. . . . To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Id.*

[30] In the above-cited opinion, Attorney General Civiletti did not ignore his power, and indeed obligation, to decline to enforce or decline to defend an unconstitutional statute, especially one violating the Constitution's separation of legislative and executive powers. *See The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation*, 4A Op. O.L.C. at 56 (in such a situation, the Attorney General "would be untrue to his office if he were to do otherwise"); *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 199 (1994) ("there are circumstances in which a President may appropriately decline to enforce a statute that he views as unconstitutional").

[31] Where a statute vests final decisionmaking authority in an executive branch official, that official must make the decision and may not — absent congressional authorization — delegate that authority to another official or to a private actor such as an arbitrator. *See id.* This case must be distinguished from the situation where the final decision of an executive official is subject to judicial review. Here, the official must make the decision in the first instance. If a challenge is subsequently brought, then absent some specific statutory bar or other legal impediment, there is nothing in the Take Care Clause that would prohibit such an official from opting for binding arbitration rather than adjudication before an Article III court. Currently, Exec. Order No. 12778 imposes an absolute prohibition on opting for binding arbitration where litigation counsel is not otherwise compelled to submit to it.

## IV. Other Article II Issues

In addition to recognizing the mandatory nature of the processes — such as the Appointments Clause — that the Constitution expressly ordains, the Supreme Court's decisions have identified broader structural principles that separate and limit the powers of the three branches of government. One important principle is that Congress may not vest itself, its members, or its agents with " 'either executive power or judicial power,' " *Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 274 (1991) (citation omitted), and that Congress therefore may not intervene in the decision making necessary to execute the law. *Bowsher*, 478 U.S. at 733-34; *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 827 (D.C. Cir. 1993), *aff'd on other grounds*, 513 U.S. 88 (1994).

"The structure of the Constitution does not permit Congress to execute the laws; it follows that Congress cannot grant to an officer under its control what it does not possess." *Bowsher*, 478 U.S. at 715, 726. Therefore, any scheme whereby Congress — whether itself or through one of its committees, members, or agents — appoints, retains removal authority over, or otherwise exercises any type of continuing authority over an arbitrator[32] violates the constitutional anti-aggrandizement principle. This principle extends to non-voting members. *NRA Political Victory Fund*, 6 F.3d at 827. Consequently, we do not believe that Congress could make one of its members or agents an *ex officio* non-voting member of an arbitral panel. *Id.*

Legislation that is consistent with the Constitution's express procedures and with the *Bowsher* principle may nonetheless affect the constitutional separation of powers by invading the constitutional roles of the executive or judicial branches. "[I]n determining whether [such an] Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977); *cf. CFTC v. Schor*, 478 U.S. 833, 856-57 (1986) ("the separation of powers question presented in this litigation is whether Congress impermissibly undermined . . . the role of the Judicial Branch"). An affirmative answer to the question of whether Congress has prevented the executive or judiciary from accomplishing its functions, furthermore, would not lead inexorably to the judicial invalidation of the statute: in that case, the Court has stated, it would proceed to "determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon*, 433 U.S. at 443.

---

[32] *Buckley* and *NRA Political Victory Fund* establish that Congress violates the anti-aggrandizement principle if it retains control over any member of a nonlegislative body, even though a single member cannot alone take any dispositive action. Thus, in the arbitration setting, it would not matter for purposes of separation of powers analysis that Congress exercises control over only a single member of, for example, a three-member arbitral panel. Such an arrangement would violate the anti-aggrandizement principle.

In the context of binding arbitration, concerns under this general separation of powers principle would arise if an arbitral panel were given authority that is constitutionally committed to the executive. For example, the Supreme Court has held that the President must retain at least some ability to control the exercise of federal criminal prosecutorial power. *See Morrison v. Olson*, 487 U.S. 654 (1988). Thus, we believe the general separation of powers principle would stand as a bar to vesting an arbitration panel with unreviewable authority to direct or control the prosecution or conduct of federal litigation by the executive branch's attorneys.

Where, on the other hand, a *dispute* over the exercise of executive authority is submitted to binding arbitration, the general separation of powers principle has little force. The principle prohibits incursions that "prevent[] the Executive Branch from accomplishing its *constitutionally assigned* functions." *Nixon*, 433 U.S. at 443 (emphasis added), *quoted in Morrison v. Olson*, 487 U.S. 654, 695 (1988). The Constitution does not, however, assign to the executive branch exclusive responsibility for resolving disputes over the exercise of its authority. The very language of Article III providing for federal court jurisdiction over disputes involving "the United States" demonstrates that the Constitution does not require that the authority to resolve such disputes over executive action be vested in the executive branch itself. Resolution of such disputes by private arbitrators, therefore, does not in itself disturb the separation of powers that the Constitution ordains.

In addition, the Constitution's text and structure grant the President a number of powers that are not, as such, subject to the general separation of powers principle; examples include the commander in chief and foreign affairs powers. The President may not be bound to the decision of an arbitrator in the exercise of these constitutional powers, whether by statute or by purported agreement of the President. Congress may not, for example, require the President to exercise the President's pardon power pursuant to the dictates of an arbitrator. *See generally United States v. Klein*, 80 U.S. 128, 148 (1871); *Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 380 (1866).

## V. Article III

Article III of the Constitution, which establishes the federal judicial branch, places at least some limitations on the ability of the federal government to submit to binding arbitration. Article III provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. This "judicial power" does not refer to all federal adjudications, however. *See, e.g., Freytag*, 501 U.S. at 909 (Scalia, J., concurring) ("there is nothing 'inherently judicial' about 'adjudication' "). The Supreme Court has long wrestled with the mandatory scope of the Article III vesting clause — that is, what federal adjudica-

tions must be committed to an Article III tribunal.[33] It is clear, however, that Article III prohibits at least some matters from being submitted to binding arbitration.

Early on, the Supreme Court settled on a general approach for resolving questions regarding Article III's scope:

> we do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.

*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855). In its generalities, this statement remains an accurate description of the Court's approach to Article III: there are three categories of determinations — those that must be submitted to an Article III tribunal, those that may be submitted to such a tribunal, and those that may not be submitted to such a tribunal.

The statement in *Murray's Lessee*, however, has been taken further to establish a so-called public rights doctrine. Under that doctrine, all federal adjudication would be required to be conducted in an Article III forum except adjudication involving a public right.[34] Public rights adjudication could presumably take whatever form Congress prescribed. Use of this doctrine reached its highwater mark in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (plurality opinion), which defined public rights as "matters arising 'between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments'" and private rights as "'the liability of one individual to another under the law as defined.'" *Id.* at 67–68, 69–70 (quoting *Crowell v. Benson*, 285 U.S. 22, 50, 51 (1932)); *see Thomas*, 473 U.S. at 585 (characterizing *Northern Pipeline*).

More recently the Court has eschewed the public rights doctrine as set forth in *Northern Pipeline*. The Court no longer accepts either the proposition that all federal adjudications of private disputes must be submitted to an Article III tri-

---

[33] Congress may, however, have power to decline to provide for any federal adjudication of some matters. *See generally* Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362 (1953). If Congress has such a power, one notable exception would be the Supreme Court's original jurisdiction, which we do not believe that Congress could eliminate. *See* U.S. Const. art. III, § 2, cl. 2.

[34] The general rule did not apply to courts for the territories or the District of Columbia, which arguably perform federal adjudication, or to the courts martial. *Northern Pipeline Constr. Co.*, 458 U.S. at 64–70.

bunal or that Article III has no force in cases between the government and an individual. *Thomas*, 473 U.S. at 585–86. The Supreme Court dismissed the public rights doctrine approach [35] as formalistic and admonished that "practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III." *Id.* at 587 (construing *Crowell v. Benson*, 285 U.S. 22 (1932)). The Court has thus directed that "the constitutionality of a given delegation of adjudicative functions to a non-Article III body . . . be assessed by reference to the purposes underlying the requirements of Article III." *Schor*, 478 U.S. at 847. The Court has identified two such purposes: the first is to fulfill a separation of powers interest — protecting the role of an independent judiciary — while the second is to protect an individual right — the right to have claims decided by judges who are free of domination by other branches. *Id.* at 848.[36] Under the separation of powers rubric, the Court has resisted adopting a formalistic approach in favor of one that looks to the actual effects on the constitutional role of the Article III judiciary. The most significant factor is whether the adjudication involves a subject matter that is part of or closely intertwined with a public regulatory scheme. We consider the implications of the purposes of Article III first in the context of a statute that mandates binding arbitration and then in the context of consensual submission to binding arbitration.[37]

## A. Statutorily Mandated Binding Arbitration

*1. Separation of Powers.* The separation of powers purpose served by Article III, Section 1 was explained in *Schor*: that vesting clause "safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts 'to transfer jurisdiction [to non-Article III tribunals] for the purpose of emascu-

---

[35] While the Court has abandoned the public rights *doctrine*, it occasionally uses the term "public rights" as a shorthand reference to matters that need not be vested in an Article III tribunal, particularly in the context of the Seventh Amendment. *See, e.g., Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *Schor*, 478 U.S. at 853 ("this Court has rejected any attempt to make determinative for Article III purposes the distinction between public rights and private rights").

[36] For the purposes of this inquiry, Article III also defines the scope of another individual right, the Seventh Amendment right to a jury trial. If an adjudication may be vested in a non-Article III tribunal, the Seventh Amendment does not prohibit non-jury fact-finding:

> [I]f [an] action must be tried under the auspices of an Article III court, then the Seventh Amendment affords the parties a right to a jury trial whenever the cause of action is legal in nature. Conversely, if Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal, then the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder.

*Granfinanciera*, 492 U.S. at 63–64.

[37] The ENRD memorandum refers to a third category — court-ordered binding arbitration. We believe that a court may order binding arbitration only if it is specifically authorized to do so. When Congress expressly commits jurisdiction to resolve cases of a particular type to the Article III judiciary, the Article III judiciary may not rewrite the jurisdictional statute to provide for final resolution by some other agent — any more than the executive may refuse to carry out a valid statutory duty. *Cf. Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *In re United States*, 816 F.2d 1083 (6th Cir. 1987). If a statute grants a court authority to order binding arbitration, the scheme is properly analyzed as an example of statutorily mandated binding arbitration. *See, e.g.,* 28 U.S.C. §§ 651–658 (authorizing federal district courts to refer matters to arbitration), 28 U.S.C. §§ 631, 636 (authorizing appointment of and establishing powers of United States Magistrate Judges).

lating' constitutional courts and thereby preventing 'the encroachment or aggrandizement of one branch at the expense of the other.' " *Id.* at 850 (quoting, respectively, *National Ins. Co. v. Tidewater Co.*, 337 U.S. 582, 644 (1949) (Vinson, C.J., dissenting), and *Buckley v. Valeo*, 424 U.S. 1, 122 (1976) (per curiam)). In reviewing assertions that a particular delegation to a non-Article III tribunal violates Article III, the Court applies a general separation of powers principle; that is, the Court looks to whether the practical effect of a delegation outside Article III is to undermine "the constitutionally assigned role of the federal judiciary." *Schor*, 478 U.S. at 851; *see Thomas*, 473 U.S. at 590 (looking to whether a delegation outside Article III "threatens the independent role of the Judiciary in our constitutional scheme").

It is not possible to draw a broad conclusion regarding the validity of statutory schemes that mandate binding arbitration, except to observe that some conceivable schemes would not violate Article III while other schemes could. *See Thomas*, 473 U.S. at 594. The Court has listed three factors that it will examine to determine whether a particular adjudication by a non-Article III tribunal, such as an arbitration panel, impermissibly undermines the constitutional role of the judiciary. The Court looks first to the extent to which essential attributes of judicial power are reserved to Article III courts and the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested in Article III courts; second to the origin and importance of the right to be adjudicated; and third to the concerns that drove Congress to place adjudication outside Article III. *Schor*, 478 U.S. at 851.

The first factor focuses on whether the subject matter entrusted to the non-Article III tribunal is restricted to a "particularized area of [the] law" or instead is relatively broad-ranging. *Id.* at 852. The more broad-ranging the tribunal's authority, the greater the likelihood of an Article III conflict. Where a tribunal has a particularized jurisdiction, however, granting the tribunal authority to entertain additional matters in the nature of counterclaims is unlikely to yield an impermissibly broad jurisdiction. Broadening the scope to reach pendent and ancillary claims would raise serious concerns. *Id.* Also relevant is the range of remedies that the tribunal is empowered to issue. The closer that range approximates the full range that might be issued by an Article III tribunal, the more suspect the non-Article III tribunal appears. Most significantly, this factor requires examination of the standard under which the determination of an arbitration panel is reviewable. *Id.* at 853. In *Thomas* the statute that mandated binding arbitration permitted judicial review only for "fraud, misconduct, or misrepresentation." 473 U.S. at 592. The Court held that this limited review "preserves the 'appropriate exercise of the judicial function' " because it "protects against arbitrators who abuse or exceed their powers or willfully misconstrue their mandate under the governing law." *Id.* (quoting *Crowell v. Benson*, 285 U.S. 22, 54 (1932)).

The second factor is the nature and importance of the right to be adjudicated by the non-Article III tribunal. First and foremost, the Supreme Court has stated that any attempt by Congress or the Executive to vest the final adjudication of questions of constitutional law outside Article III courts[38] would raise serious constitutional concerns, *see Thomas*, 473 U.S. at 592, although we acknowledge that the Court has never resolved this question. In any event, this is not to say that constitutional claims may not ever be submitted to arbitration as an initial matter. *See, e.g., Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984). Rather, the serious constitutional concerns that the Court has raised are avoided only if matters of constitutional law must ultimately be subject to judicial review even if the matter may not have initially been submitted to an Article III tribunal.[39] To avoid ruling unnecessarily on the difficult constitutional question, the Supreme Court has required that Congress's intent to preclude judicial review of constitutional claims be clear before the Court will entertain the validity of such preclusion. *See, e.g., Webster v. Doe*, 486 U.S. 592 (1988); *Weinberger v. Salfi*, 422 U.S. 749 (1975); *Johnson v. Robison*, 415 U.S. 361, 373–74 (1974). Without such clear congressional intent, a statute that simply purports to prohibit judicial review will not prohibit judicial review of constitutional questions.[40]

In addition to constitutional issues, there are other rights the Court views as being "at the 'core' of matters normally reserved to Article III courts." *Schor*, 478 U.S. at 853. This category was set forth as far back as *Murray's Lessee* and includes "suit[s] at common law, or in equity, or admiralty," *Murray's Lessee*, 59 U.S. at 284, as well as claims of a "state-law character," *see Northern Pipeline*, 458 U.S. at 100. Because these matters historically have been perceived to lie at the core of Article III, attempts to withdraw them from "judicial cognizance" are subject to "searching" scrutiny. *Schor*, 478 U.S. at 854. The Court, however, has rejected the contention that Article III works a blanket proscription on entrusting the resolution of such matters to non-Article III tribunals. *See id.* at 853 (separation of powers principles do not support "accord[ing] the state law character of a claim talismanic power in Article III inquiries"). Instead, we are to examine the specific adjudication vested outside Article III, focusing on whether "Congress has . . . attempted to withdraw from judicial cognizance" the deter-

[38] Of course, some constitutional issues may arise that are not justiciable by an Article III court. *See, e.g., Goldwater v. Carter*, 444 U.S. 996 (1979). This does not mean that no government actor will make a determination based on constitutional interpretation as to how to proceed. We would not, however, regard this as an "adjudication."

[39] We do not mean to indicate that a party may never waive a constitutional claim or be barred from asserting a constitutional claim for procedural reasons such as failure to exhaust a statutory remedy, including submission to arbitration.

[40] The Supreme Court has held questions relating only to "the interpretation or application of a particular provision of [a] statute to a particular set of facts" are not themselves constitutional questions and that Congress may bar judicial review of such claims. *See Robison*, 415 U.S. at 367. The courts have been vigilant in rejecting attempts by litigants to characterize as constitutional claims, especially under the Due Process Clause, what are in fact challenges to "the interpretation or application of a particular provision of [a] statute to a particular set of facts." *Id.; see, e.g., Sugrue v. Derwinski*, 26 F.3d 8, 11 (2d Cir. 1994) (holding claimants cannot obtain judicial review of "benefits determinations merely because those challenges are cloaked in constitutional terms"), *cert. denied*, 515 U.S. 1102 (1995).

mination of these core claims. *Id.* at 854. Here, we will look to the scope of the non-Article III tribunal's jurisdiction over core Article III claims, the extent to which the scope of that jurisdiction is tailored to "valid and specific legislative necessities," and the extent to which determinations made by the non-Article III tribunal are subject to Article III review. *Id.* at 855.

On the other hand, when Congress creates rights outside Article III's core, most of the matters that arise in connection with these rights can be "conclusively determined by the Executive and Legislative Branches." *Thomas*, 473 U.S. at 569, 589. The prototype of such non-core matters are rights created by statute as part of or intertwined with a complicated regulatory scheme. *See Schor*, 478 U.S. at 853–54; *Thomas*, 473 U.S. at 589–90. Where this is the case, "the danger of [Congress or the executive] encroaching on the judicial powers is reduced." *Id.* at 589. Statutes mandating binding arbitration to resolve disputes that arise in connection with these rights are unlikely to contravene Article III. That is not to say that such schemes cannot run afoul of Article III. *But see* Gordon G. Young, *Public Rights and the Federal Judicial Power: From Murray's Lessee through Crowell to Schor*, 35 Buff. L. Rev. 765, 792, 842 n.360 (1986). While the Supreme Court has observed that the threat of encroachment is "reduced," in such circumstances, it has rejected the contention that Article III has no force in these cases. *See Thomas*, 473 U.S. at 589.

The third factor, the purpose underlying the departure from Article III adjudication, has little independent force. That factor looks to whether Congress has attempted to "emasculate" the judiciary by enacting a particular binding arbitration requirement. Thus, Article III prohibits Congress from "creat[ing] a phalanx of non-Article III tribunals equipped to handle the entire business of the Article III courts without any Article III supervision or control." *Schor*, 478 U.S. at 855. Absent such a purpose, however, this factor alone would not limit Congress's authority to enact a mandatory binding arbitration scheme. *See Thomas*, 473 U.S. at 590; *Crowell*, 285 U.S. at 46.

The factors listed above should not be considered in isolation from one another. *See, e.g., Thomas*, 473 U.S. at 592 (holding limit on judicial review permissible "in the circumstances" of that statutory scheme). For instance, the limited review upheld in *Thomas* applied to adjudication of a right that was "closely integrated into a public regulatory scheme." *Id.* at 594. If the right at issue had been closer to the core with which Article III is particularly concerned, such limited review might not have been approved. All of this is by way of demonstration that Article III does not draw bright lines and so does not permit more specific guidance than we have set forth. Whether a particular statutory scheme impermissibly

undermines the constitutional role of the judiciary can only be determined by reviewing the facts and context of each such scheme.[41]

*2. Individual Rights.* Article III also safeguards the right of litigants to have claims decided by "judges who are free from potential domination by other branches of government." *Schor,* 478 U.S. at 848. It is doubtful that the government possesses this individual right.[42] Even if it does, this individual right may be waived. *See id.* at 850–51; *Thomas,* 473 U.S. at 592–93. Where Congress enacts a statute that requires the government to submit to binding arbitration, that statute — as in the context of sovereign immunity — acts as a waiver of whatever right the government might have to litigate in an Article III tribunal. The extent to which private litigants may be statutorily compelled to submit to binding arbitration is beyond the scope of the present inquiry.[43]

## B. Consensual Binding Arbitration

Where there is no statute requiring parties to enter into binding arbitration, the parties may nevertheless agree to do so. The same may be said of the government when it is a party. Absent a statute to the contrary and assuming the availability of authority to effect any remedy that might result from the arbitration, we perceive no broad constitutional prohibition on the government entering into binding arbitration. Such arrangements, however, are still technically subject to scrutiny for conformity to the purposes underlying Article III. *See Schor,* 478 U.S. at 850–51 (separation of powers violation may occur even though parties have consented). It is difficult to *see* how the executive — litigating on behalf of the government — impermissibly undermines the role of the judicial branch by agreeing to resolve a particular dispute through binding arbitration. *See Thomas,* 473 U.S. at 591 (danger of encroachment is at a minimum where parties consent to arbitration).[44] As to Article III's purpose of safeguarding the individual right to independent adjudication, it is sufficient, where the parties consent, if the agreement preserves Article III review of constitutional issues and permits an Article III tribunal to

---

[41] As the Supreme Court instructed in *Schor,* "due regard must be given in each case to the unique aspects of the congressional plan at issue and its practical consequences in light of the larger concerns that underlie Article III." 478 U.S. at 857.

[42] Governmental interests are generally viewed under the heading of separation of powers. The assertion that Congress impermissibly invades the executive by compelling the executive to submit to binding arbitration, for example, is in essence an argument that Congress has violated the separation of powers. We assessed these arguments in sections III and IV.

[43] We note that in *Thomas,* the Court seemed to indicate that private parties could be required to submit to binding arbitration as long as the arbitration process satisfied the requirements of due process. 473 U.S. at 592–93. The Court had no occasion to define the specific requirements of due process in the binding arbitration context because the parties had waived their due process objections. In addition, a requirement that private parties submit to binding arbitration could not be imposed in such a way as to work an unconstitutional condition. *See* Martin H. Redish, *Legislative Courts, Administrative Agencies, and the Northern Pipeline Decision,* 1983 Duke L.J. 197, 212–14; *see also Thomas,* 473 U.S. at 596 n.1 (Brennan, J., concurring).

[44] If, however, the executive branch were to adopt and pursue a policy of entering into binding arbitration in a systematic manner designed to undermine the judiciary's constitutional role, a serious constitutional question would arise.

review the arbitrators' determinations for fraud, misconduct, or misrepresentation. *Id.* at 592. Such agreements should also describe the scope and nature of the remedy that may be imposed and care should be taken to insure that statutory authority exists to effect the potential remedy.

## C. The Non-Delegation Doctrine

The previous discussion demonstrates that, at least in some instances, a non-Article III tribunal may conduct federal adjudication. It might still be contended that the constitutional non-delegation doctrine prohibits federal arbitral power from being vested in private actors. The Supreme Court's decisions in *Auffmordt* and *Kendall*, however, strongly implied that there is no per se proscription on placing arbitral authority in private actors. We view the Supreme Court's opinion in *Thomas* as finally rejecting the argument that the Constitution prohibits the delegation of adjudicative authority in a private party. In *Thomas* the Court found no particular relevance in the fact that the adjudication was to be performed by "civilian arbitrators, selected by agreement of the parties" as long as the circumstances do not indicate that this mechanism would "diminish the likelihood of impartial decisionmaking, free from political influence." 473 U.S. at 590. As with all delegations, there must be standards to guide the determination of the recipient of the delegated adjudicative authority, but this is not an exacting requirement. *See id.* at 593; *see generally Yakus v. United States*, 321 U.S. 414 (1944). As long as these two criteria — impartiality and discernable standards — are present, the non-delegation doctrine does not represent a blanket prohibition of final and binding resolution of a dispute by private actors.

## VI. Due Process

The Due Process Clause, U.S. Const. amend. V, does not prohibit the final resolution of claims, including claims involving the government, through binding arbitration. For instance, claims for reimbursement through Part B of the Medicare program, 42 U.S.C. §§ 1395j to 1395w–4, are subject to the final and unreviewable determination of a hearing officer who is hired by the insurance carrier with which the federal government contracts for administration of the program. *See United States v. Erika, Inc.* 456 U.S. 201 (1982). The Supreme Court rejected the contention "that due process requires an additional administrative or judicial review by a Government rather than a carrier-appointed hearing officer." *Schweiker*, 456 U.S. at 198 (1982). The Due Process Clause does not establish bright-line requirements or prohibitions; rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

Whether an arbitrator with authority to issue a final, binding decision may be a private actor or must be a government official, or whether any other facet of an arbitration proceeding is consistent with the Due Process Clause, is determined by reference to three relevant factors. Those factors are: the private interest that will be affected by the official action; the risk of erroneous deprivation through the procedures used and the probable value of additional or substitute safeguards; and the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See Schweiker*, 456 U.S. at 198–200; *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). The precise requirements of these factors will vary depending on the facts and circumstances of each specific arbitration. While they may in some instance combine to require that a final, binding decision be vested in a government official, Schweiker stands for the proposition that the Due Process Clause does not per se prohibit vesting such a decision in a private actor.

## VII. Conclusion

We reaffirm our conclusion that the Appointments Clause does not prohibit the federal government from submitting to binding arbitration. In addition, we do not view any other constitutional provision or doctrine as imposing a general prohibition against the federal government entering into binding arbitration. Nevertheless, we do recognize that the Constitution imposes substantial limits on the authority of the federal government to enter into binding arbitration in specific cases.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*